IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION AT JACKSON


WILLIAM GRIFFIN and      )
BILLIE GRIFFIN,      )
                         )
     Plaintiffs,         )
                         )
     vs.                 )CASE NO.
                         )1:21-cv-02818-STA-jay
AMERICAN SELECT          )
INSURANCE COMPANY d/b/a  )
WESTFIELD,               )
                         )
          Defendant.     )
_____)




          DEPOSITION OF:

          DOUGLAS HALL

          Taken on Behalf of the Plaintiffs

          September 30, 2022









          BERES & ASSOCIATES COURT REPORTERS
          Katherine Gale, CSR, RPR, LCR
               P.O. Box 190461
          Nashville, Tennessee 37219-0461
               (615) 742-2550
          katherine@beresandassociates.com

1                    A P P E A R A N C E S

2      FOR THE PLAINTIFFS:

3                    ALEXANDRIA S. FISHER, ESQ.
                     Morgan & Morgan
4                    810 Broadway
                     Suite 105
5                    Nashville, Tennessee 37203
                     615.251.6502
6                    afisher@forthepeople.com

7

       FOR THE DEFENDANT:
8
                     JAMES R. TOMKINS, ESQ.
9                    Smith & Tomkins
                     25 Century Boulevard
10                   Suite 606
                     Nashville, Tennessee 37214
11                   615.256.1280
                     jtomkins@smithtomkins.com
12

13     ALSO PRESENT:

14                   WILLIAM GRIFFIN

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2    WITNESS:  DOUGLAS HALL

3        Examination

4            By Ms. Fisher........................05

5

6                  E X H I B I T
                    I N D E X
7

8    Exhibit 1   Notice of Deposition                07

9    Exhibit 2   Guidelines Applicable to Claim      35
                 (Late-Filed)
10
     Exhibit 3   Claim Notes                         46
11
     Exhibit 4   Griffin Preferred Photos            66
12
     Exhibit 5   Claim Determination                 69
13
     Exhibit 6   Certified Policy                    74
14
     Exhibit 7   Responses to Requests for           79
15               Admissions

16   Exhibit 8   Griffin Application                 86

17   Exhibit 9   Underwriting Guidelines             90

18

19

20

21

22

23

24

25

1             The deposition of DOUGLAS HALL, taken

2    on behalf of the Plaintiff, on Friday, the 30th

3    day of September, 2022, at 1:03 P.M., via

4    videoconference, for all purposes under the

5    Federal Rules of Civil Procedure.

6             The formalities as to notice, caption,

7    certificate, et cetera, are expressly waived.  All

8    objections, except as to the form of the

9    questions, are reserved to the trial.

10             The signature of the witness was not

11    discussed.

12                  * * * * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    DOUGLAS HALL

2    was called as a witness, and after having been

3    first duly sworn, testified as follows:

4                     EXAMINATION

5    BY MS. FISHER:

6    Q     Hi, Mr. Hall.  My name is Alex Fisher; I'm

7    an attorney at Morgan & Morgan.  I represent

8    William & Billie Griffin in this case.

9               How are you?

10   A     I'm good.  Thank you.

11   Q     I'm going to ask you some questions today

12   about the topics listed in Plaintiff's Notice of

13   Deposition for a corporate representative.

14               Would you prefer that I refer to your

15   company as Westfield or as American Select?  Or

16   are you fine with either?

17   A     I would prefer American Select, but I'll

18   understand your reference if you refer to

19   Westfield.

20   Q     All right.  Well, I'll try to keep it

21   consistent today.

22               I'm sure you know the normal ground

23   rules, but answer all the questions verbally

24   rather than shaking your head.  We'll try to do

25   our best to make life a little bit easier for

```
1    Ms. Gale this afternoon and not talk over each
2    other.  So when I'm done asking a question, if you
3    could just wait a sec to make sure I'm done.  And
4    then, I might pause to make sure you're done
5    answering to make sure you're totally done
6    answering before I ask my next question.  Sound
7    good?
8    A    I understand.
9    Q    If you don't understand my question either
10   because of a technical difficulty or the way I've
11   asked it, just let me know, and I can ask it a
12   different way or fix whatever technical issues are
13   going on.  All right?
14   A    I will.
15   Q    All right.  I don't expect we'll go
16   particularly long, but if you need a break, just
17   let me know, and we'll take one.  Any questions
18   for me before we get started?
19   A    Not at this time.
20   Q    All right.  Please state your full name for
21   the record.
22   A    Douglas Christopher Hall, H-a-l-l.
23   Q    And what's your title at American Select?
24   A    Complex property litigation manager.
25   Q    All right.  I'm going to share with you a
```

1   document that I've provided to everybody in

2   advance today.  It's "1-2022.09.12, Notice of

3   30(b)(6) Depo (Griffin.)"  Bear with me one second

4   while I share my screen here.

5              All right.  This is a three-page

6   document.  Were you informed about this Notice of

7   Deposition and the topics in it?  Or were you

8   provided a copy of this by your counsel in advance

9   of this afternoon?

10  A     Yes, I was.

11  Q     Okay.  Great.  Let's go ahead and make this

12  Exhibit 1 to your deposition.

13             (Marked Exhibit 1.)

14  BY MS. FISHER:

15  Q     I'd like to go through the topics just to

16  confirm that you're prepared to testify about

17  them.  Or if there are any objections, of course,

18  to give your counsel an opportunity to note those

19  for the record.

20             We've asked you -- we've asked

21  American Select to "Designate one or more

22  officers, directors, managing agents, or people to

23  testify regarding the following topics:

24             "1.  The investigative process of the

25  claim submitted by Plaintiff to Defendant until

1  the time of decision to deny or approve

2  Plaintiff's claim.

3          "2.  The facts and evidence supporting

4  Defendant's Answer and Affirmative Defenses in

5  response to Plaintiff's Complaint.

6          "3.  Facts and evidence supporting

7  Defendant's responses to Plaintiff's discovery

8  requests."

9          And I'll stop there.  Are you prepared

10 to testify today about Topics 1 through 3?

11 A      I am.

12 Q      Okay.  Great.

13         I'll go on to Topic 4:  "The identity

14 of and Defendant's financial relationship with any

15 and all individuals and/or entities involved in

16 the investigation and/or adjustment of the claim,

17 including, but not limited to (i) the total amount

18 of money Defendant or its representatives has paid

19 each individual and/or entity; (ii) the number of

20 times Defendant or its representatives have hired

21 each individual and/or entity within the last five

22 years preceding the date of the report prepared by

23 each individual and/or entity; (iii) the year in

24 which Defendant first retained each individual

25 and/or entity; and (iv) the number of

1 projects/claims each individual and/or entity is

2 currently retained on behalf of the Defendant or

3 Defendant's representatives."

4          Are you prepared to testify about

5 Topic 4 today?

6 A      I'm prepared to testify regarding the topic

7 generally.  I understand this inquiry is out

8 there, Attorney Fisher, and that we are in the

9 process, I believe, of supplementing our discovery

10 responses to you in regard to this inquiry.

11 Q      Okay.  Perfect.

12          And I'll note for the record that I

13 did receive some documents early this morning that

14 were -- that were responsive in part to this

15 topic.  So if there's anything we talk about in

16 this regard that we don't have, we can always mark

17 it a late-filed exhibit.

18          All right.  Topic 5:  "Any

19 inspections, evaluations, reports, and/or

20 appraisals related to the insured property,

21 located at 128 Poplar Street, Gadsden, Tennessee,

22 38337-3546, in the underwriting file."

23          Are you prepared to testify about that

24 topic today?

25 A      I am.

1  Q     All right.  Topic 6:  "The underwriting

2  guidelines in effect for the insured property at

3  issue in this lawsuit at the time of the

4  Plaintiff's original application for insurance."

5            Are you prepared to testify about

6  Topic 6?

7  A     Yes.  I'm familiar with the guidelines and

8  the policy that's at issue.

9  Q     Okay.  And then finally, Topic 7:  "The

10 names and addresses of the companies who performed

11 inspections for the underwriting department at the

12 time of Plaintiff's original application and all

13 renewals for insurance on the property at issue in

14 this lawsuit."

15            Are you prepared to testify about that

16 topic?

17 A     I am.

18 Q     Okay.  And then I've asked you to bring the

19 following with you, and I believe this has already

20 been provided, but I'll just read it into the

21 record for completeness.

22            "All non-privileged portions of the

23 claim file regarding Claim Number: 0002108959 and

24 the subject property, including all photographs in

25 their native digital format."

1    Have you provided that to your counsel

2    to provide us in discovery in this matter?

3    A    Yes.  I believe that the -- the claim file's

4    been provided, subject to certain redactions.  And

5    that material has been produced during the

6    discovery process.

7    Q    All right.  And then b:  "Copies of any and

8    all IRS 1099 Forms, W-9, or other comparable

9    documentation for any and all amounts paid by the

10   Defendant to others related to Claim Number:

11   0002108959 for any reason whatsoever."

12   Have you provided that to your

13   counsel?

14   A    And again, I believe that's been part of

15   the -- and I apologize, I believe that's been part

16   of the supplemental response to discovery.  And

17   you may have received -- I don't know that you

18   received those materials this morning.

19   MR. TOMKINS:  We did send those, I

20   think, this morning.  And then earlier in the

21   document production and stuff, I think we've sent

22   copies of the information regarding payment on

23   this particular claim, but then we supplemented

24   this morning with additional documents regarding

25   payments to those vendors on other claims to the

1  extent that we could pull that together or had

2  anything that we could provide.

3           MS. FISHER:  Understood.  Thank you.

4           And, Mr. Tomkins, I saw in this

5  supplemental discovery this morning information

6  related to EFI, the engineering firm that was

7  hired.

8           MR. TOMKINS:  Yes.

9           MS. FISHER:  And the information

10  regarded Crawford & Company, but I believe -- is

11  Phillip Allen part of Crawford & Company?

12           MR. TOMKINS:  They are a -- yeah,

13  they're hired by Crawford & Company, and the

14  payment is handled, as I understand, to Crawford &

15  Company.  But yeah, that's who that is.  That's

16  the Phillip Allen estimate guy.

17           MS. FISHER:  Okay.  Great.  I

18  recognized the name Crawford & Company because

19  I've seen them in the industry.  I just wanted

20  some clarification on how they, you know, were

21  over Phillip Allen.  Thank you.

22           MR. TOMKINS:  Yeah, sorry about that.

23  Yeah, they're -- I think the companies like

24  Phillip Allen and them are actually subcontractors

25  of Crawford, but they handle the management of

1   that.

2            MS. FISHER:  That's perfect.  That

3   makes sense.

4            MR. TOMKINS:  I used to be an old

5   Crawford & Company employee myself in a prior

6   lifetime.

7            MS. FISHER:  Oh, my next-door neighbor

8   works at Crawford & Company, so I feel like I get

9   the scoop on all the projects they have going on,

10   in Nashville at least, from him.

11            MR. TOMKINS:  Oh, gosh.  It's crazy.

12   BY MS. FISHER:

13   Q    All right.  Mr. Hall, I'm not asking you

14   about any conversations with Mr. Tomkins, but what

15   did you do to prepare for your deposition today?

16   A    I've reviewed the claim file materials, the

17   materials that have been provided in the

18   production of this case.  I've reviewed the policy

19   that's at issue.  I've reviewed the responses,

20   Plaintiff's Complaint, American Select's response

21   to that Complaint.  I've looked at the Notice of

22   Deposition that you just shared with me; I

23   reviewed that for the purposes of being prepared

24   to be responsive to your inquiries.

25   Q    All right.  Anything else that you reviewed

1    that you haven't already listed?

2    A     In regards to this litigation?

3    Q     Yes, in preparing for your deposition today.

4    A     Basically, I would say the claims file

5    and the underwriting file materials and the

6    litigation -- the documents compiled in the

7    litigation.

8    Q     All right.  And you are here today as a

9    corporate representative for American Select.

10   You're not here in an individual capacity;

11   correct?

12   A     That's correct.

13   Q     All right.  Mr. Hall, talk me through your

14   educational background starting with high school,

15   the name of it, where it was located, all the way

16   through your highest level of education.

17   A     I went to Montour High School in Robinson

18   Township, Pennsylvania, which is a suburb of

19   Pittsburgh.  I attended the University of

20   Pittsburgh in Oakland, a suburb of Pittsburgh,

21   Pennsylvania, where I obtained a bachelor's degree

22   in the history and philosophy of science.

23             Post graduation from the University of

24   Pittsburgh, I have obtained multiple insurance

25   designations:  chartered property casualty

1  underwriter, senior claim law associate, associate

2  in claims, and associate risk management

3  certificates.  And over my, at this point, I

4  think, about 29 years in the insurance industry,

5  I've taken and attended many seminars and courses

6  throughout the course of those many years.

7  Q     Okay.  For those insurance designations, if

8  you could go back and slow down and tell me what

9  each of those is, what the entity or institution

10 you got the designation from and what year you got

11 it, if you recall.

12 A     So SCLA is senior claim law associate.  It's

13 an associate program that is available to -- may

14 be available to people even outside the industry,

15 but it's certainly available to folks in the

16 insurance industry, I believe, now that it's part

17 of the American Educational Institute.  When I

18 obtained the designation back in, I'm going to

19 guess, Attorney Fisher, that was in the late '90s

20 when I obtained the SCLA or maybe the early 2000s.

21        The associate in claims is an American

22 Educational Institute program as well, and that --

23 I would have obtained that probably in the early

24 2000s to mid-2005, maybe, somewhere in that area.

25        The chartered property casualty

1   underwriter designation I earned, again, probably

2   in the mid-2000 -- somewhere in 2005, '06, '07,

3   '08, something in that range.  That's from the

4   Chartered Property Casualty Underwriter's

5   Association.

6           And then the associate and risk

7   management is a designation I earned in the -- in

8   the mid-2000s as well.  I apologize, but the years

9   kind of run together at this point.

10  Q     That is all right.

11          Do you have any professional licenses?

12  Are you licensed in any states related to the

13  insurance industry?

14  A     I am licensed in -- and I, unfortunately,

15  will guess -- 25 states.  I hold licenses to

16  adjust and/or investigate claims in probably 20 to

17  25 states.

18  Q     Tennessee isn't one of those states that

19  require licensure to adjust claims here.  Am I

20  correct in that understanding?

21  A     That's my understanding.

22  Q     Okay.  I know you've been in the industry

23  for a while.  Any notable training that you've had

24  in the insurance industry that you can recall and

25  tell me about?

1   A     Again, over the many years, I've been

2   involved in teaching, presenting, and sitting

3   through seminars on all various aspects of the

4   insurance industry, insurance buyer claims

5   environment.  Other than the -- the course work, I

6   guess, is the way I would phrase it, to obtain the

7   designations I previously discussed, you know, I

8   can't really point to one thing that -- that I've

9   done that's more important or less important than

10   any of the others.

11   Q     All right.  Are you a member of any trade

12   group, association, or organization concerning the

13   insurance industry?

14   A     Not at this time.

15   Q     How long have you been employed with

16   American Select?

17   A     I believe this is my 27th year with American

18   Select.

19   Q     And you said you've been in the industry 29

20   years, so where did you work for those first two

21   years in the insurance industry before you moved

22   to American Select?

23   A     A small company called Celina Group out of

24   Grand Lake Saint Mary's, Ohio.

25   Q     Can you spell that for the court reporter?

1  A    Yes.  It's C-e-l-i-n-a, Celina Group.

2  Q    What do they do?

3  A    They're a very small, at that time, four or

4  five-state property and casualty insurer, both

5  auto, residential, commercial insurer.

6  Q    And what was your role there?

7  A    I was a claims representative.  That was my

8  first -- I guess I should have started by saying

9  that's where I started my insurance career was

10 with Celina as a claim representative.

11 Q    All right.  What years were you there?

12 A    It would have been very early, 2 -- no, I'm

13 sorry, 1994, July of '94 through, I guess, October

14 of '96 or '97 before I came over to American

15 Select or Westfield.

16 Q    Have you given a deposition before?

17 A    Yes, I have.

18 Q    How many times, approximately?

19 A    As a corporate designee or as a fact

20 witness?

21 Q    We'll go through each separately.

22        As a corporate rep?

23 A    A dozen.

24 Q    And as a fact witness?

25 A    Various times.  I would be guessing in

1  excess of -- in excess of a dozen.  Probably in

2  excess of 20.

3  Q     All right.  In those depositions for which

4  you were a fact witness, were you a fact witness

5  in your role as a claims adjuster?  Or were those

6  depositions where you were a fact witness

7  unrelated to the insurance industry, unrelated to

8  your professional life?

9  A     Both as a claims professional and as a file

10 supervisor, and I couldn't even guess as to what

11 the breakdown would be.

12 Q     But all of them were in a, for lack of a

13 better designator, professional capacity.  You

14 weren't a witness for a personal lawsuit; is that

15 fair to say?

16 A     No, all in the professional capacity -- in

17 the claims capacity in one way, shape, or form.

18 Q     Got it.

19        And were all of those during your time

20 at American Select?  Or did you give any

21 depositions when you were at the Celina Group?

22 A     I can't recall whether I gave deposition

23 testimony at Celina or not, honestly.  Yeah, I may

24 have.

25 Q     Have you -- or let me ask this:  When was

1  your most recent deposition prior to today?

2  A      It was this year, 2022.  I believe it was

3  this year, maybe in February of 2022.

4  Q      Have you ever testified --

5  A      And that's a guess.  My apologies.  I didn't

6  mean to speak over you.

7  Q      Have you ever testified at trial?

8  A      Yes.

9  Q      About how many times?

10 A      Civil trial, I think, on two occasions.

11 Criminal trial, on at least one or two occasions

12 as well.

13 Q      For the civil trials, the two occasions, do

14 you recall if that was in Federal Court or State

15 Court?

16 A      I do not recall.  I would be guessing.

17 Q      Do you recall what state the trials were in?

18 A      One was in the state of West Virginia and

19 one was in the state of Pennsylvania.

20 Q      The two trials you testified in, were you

21 either a corporate rep or a fact witness in a

22 professional capacity as related to an insurance

23 claim or something related to insurance at

24 American Select?

25 A      I can't recall in the West Virginia matter

1    if I was with Celina or American Select.  And I'm

2    thinking that I may have testified in Ohio as a

3    fact witness.  All would be fact witness testimony

4    in relation to claims.

5    Q    Okay.  All right.

6            Tell me about the criminal trial, the

7    one or two that you testified at.  Give me some

8    context:  Where it was located, what those cases

9    were about.

10   A    I believe that I've testified at least

11   twice, and the only -- as I said that, I realized

12   you might ask that question.  One of those matters

13   was in Pennsylvania in the -- I forget what

14   county, Middle -- Central Pennsylvania.  I can't

15   recall the county off the top of my head.

16           That was a case involving a district

17   attorney bringing an insurance fraud action

18   against a policyholder, and I was subpoenaed to

19   testify in regard to some of the information

20   related to that claim matter.

21   Q    All right.  So that was one of the criminal

22   trials that you testified at.  Do you recall any

23   details about the other one, the criminal trial

24   that you testified at?

25   A    I apologize.  I do not recall.  As I sit

1   here, I can't even recall what state that -- that

2   that occurred in.  I apologize.  It's been a

3   while.

4   Q     That's all right.

5             When did you start at American Select?

6   A     October of -- it had to be October of

7   2000 -- or excuse me, 1996 or '97, in that --

8   that's a guess, but that's pretty close.

9   Q     All right.  And we know your current title,

10  complex property litigation manager.

11            Mr. Hall, could you walk me through,

12  to the best of your recollection, the other titles

13  you've held at American Select starting in 1996 up

14  until your current title?

15  A     My -- when I first -- so it would have

16  been -- I think at that time, it was claims

17  representative, was my first job role.  Then after

18  that, regional property specialist.  Then, I

19  believe, I moved into a claims specialist role; I

20  believe the title was claims specialist.  Then I

21  became a general adjuster.  Then I moved into a

22  regional property supervision role, and I believe

23  when I started that role, it was referenced to as

24  a regional claim -- regional claim associate,

25  maybe, and that title changed at some point.  And

1    then, I moved into a role as a complex claim unit

2    leader.  And then, from that particular title and

3    responsibilities, I moved into the role of the

4    property litigation manager, my current role.  I

5    may be forgetting one in there somewhere.

6    Q      During that time, have you always worked in

7    the residential property line?  Or did you do auto

8    or commercial property as well?

9    A      I've either adjusted, handled, or supervised

10   claims involving, really, what I would consider

11   all lines of traditional P&C business.  I've

12   adjusted and supervised claims in the casualty

13   environment, commercial, and what I'll call

14   residential, which is not necessarily the correct

15   terminology.  I've handled and supervised

16   residential property -- residential and commercial

17   claims.  I've handled work comp claims.  I handled

18   and supervised and managed our Westfield, that is,

19   American Select's Fidelity employee dishonesty

20   group.

21           So I -- regarding your question, my

22   roles here at American Select have been diverse

23   commercial and residential in nature, including

24   casualty work as well.

25   Q      In your current role, complex property

```
 1  litigation manager, do you cover a certain
 2  geographic region?
 3  A      No.  Westfield actively writes in, I
 4  believe, 21 states today, but we have ancillary
 5  business, because of the commercial markets, in
 6  really every state.  So I am engaged in litigation
 7  management in the -- for the country.
 8  Q      Anywhere outside the United States that your
 9  position would encompass?
10  A      No.
11  Q      Talk me through your responsibilities in
12  your current role.
13  A      So in the litigation management role, I
14  facilitate a number of, I guess, actions or
15  activities.  My primary responsibility is the
16  management of active litigation in our operating
17  territories.  Second -- secondarily, I'm involved
18  in appraisal matters in, again, throughout our
19  operating territories.  I assist in regard to
20  aspects of panel counsel, our defense firms, and,
21  I guess, in a general sense, challenging claim or
22  claim environment matters are issues that I'm
23  often tasked with addressing in some way, shape,
24  or form.  I assist with training in the
25  development of claims staff.  There are a number
```

1    of, you know, portions and actions necessary in

2    the role.

3    Q      Does anyone report directly to you?

4    A      It seems like a very direct question,

5    Attorney Fisher.  Nobody reports directly to me in

6    my function as a litigation manager.  Folks report

7    to me in respect to a file they may have handled

8    or been handling that falls into -- that

9    progresses to litigation for whatever reason.

10             In respect to appraisal matters, at

11   times, I'll have people report directly to me,

12   depending on what the situation is.  And then,

13   since I may take over the supervision of a file

14   for whatever reason, the claim handler would

15   report directly to me on that matter at that point

16   in time.

17   Q      Who do you report to?

18   A      I report to Don Meier.

19   Q      What's her title?

20   A      His.  It's Donald; I should have said that.

21             Honestly, I'm not -- as we sit here

22   today, I'm not positive I know exactly what his

23   title is.  He is the -- I think his title is

24   complex claims unit leader.  I may have that

25   slightly off, but it's something close to that.

1    Q      Mr. Meier, are there -- how many people does

2    he supervise that have the same title as you,

3    complex property litigation manager?

4    A      I want to make sure I understood.

5            How many people does he supervise that

6    have the same title that I hold?

7    Q      Yes.

8    A      Just myself.

9    Q      Okay.  I didn't know if there were, like,

10   three or four for the whole country, and you all

11   divided things up or -- I was just trying to get a

12   sense of the structure.

13           So are you ever brought in while a

14   claim is still being investigated?  Or are you

15   typically brought in on a file after the claim has

16   already been investigated and a claim decision has

17   been issued?

18   A      I would -- I would guess, purely a guess,

19   that 80 to 90 percent of the files that I see in

20   my primary role as litigation manager are files

21   that have gotten to the litigation stage.

22           To be responsive to your question, the

23   other 20 percent of files, I would say, are still

24   in some semblance in the investigative stage in

25   that most of that 20 percent would be made up of

1    appraisal matters.  And while there might not

2    be -- I guess for clarification, I don't know that

3    there's always investigation at that point that's

4    going on, but just to be responsive to you, there

5    certainly are files that will come to my attention

6    that are in the investigative stage.  It's not the

7    majority.  It would be the minority in my current

8    role.

9    Q    How long have you been in your current role?

10   A    The job title that I currently hold was

11   created, I believe, in 2020; I'll say the first

12   quarter.  The job responsibilities that I

13   currently am responsible for is a role that I

14   transitioned into, I believe, probably two to

15   three years before that, but the title was

16   actually created in, I believe, and I'm fairly

17   certain, the first quarter of 2020 was when that

18   title was created.

19   Q    All right.  If you recall from your time as

20   a claims specialist at American Select, when it

21   comes time to make a decision on a claim in terms

22   of providing payment or denying coverage or some

23   combination of the two, is that something most

24   claims specialists are able to handle on their

25   own?  Or are there others within American Select

1  who they normally consult with prior to making

2  such a decision?

3  A     I'm not sure I understand -- your

4  question -- the way you phrased your question.

5  You're asking about claims specialists, and I want

6  to make sure that --

7  Q     Oh, my apologies.  Go ahead.

8  A     I just want to make sure I'm addressing --

9  are you asking in general about a -- for example,

10  a property claim that is disseminate to Westfield?

11  Or are you asking about -- because different job

12  titles, a specialist versus a claims professional,

13  they're a different hierarchy in the strata, so

14  I'm trying to make sure I understand.  If you're

15  asking generally, I want to answer that question

16  from versus for a specialist that may be

17  different.

18  Q     Thank you so much for clarifying.

19          Yes, I'm asking generally how that's

20  handled at American Select.

21  A     So I'll answer it this way, and I'm just

22  going to apply it to the claim that we're -- you

23  know, the lawsuit that we're talking about today.

24          This file was handled by a claims

25  professional, Michael Johnson, and his direct

1   supervisor was Todd Boose, and that's B-o-o-s-e.

2          So Michael was tasked as the claims

3   professional to investigate the claim, gather an

4   understanding of the facts and circumstances of

5   the loss, evaluate coverage, the typical -- what I

6   would consider typical functions.  And in that

7   role, he has responsibilities and authority, of

8   course, but he also has a supervisor, in this

9   case, Mr. Boose.

10         And we -- in this case, as I know it

11  from reviewing the file, Mr. Johnson investigated

12  the claim, and a decision was ultimately rendered

13  on this particular claim.  That decision was

14  discussed and communicated back and forth between

15  he and his supervisor, Mr. Boose.

16         And I would say that that would be

17  typical of a claim evaluation within American

18  Select, that a file handler would be tasked with

19  the responsibility of handling the claim.  And

20  that he or she would have communication with the

21  assigning professional supervisor regarding a

22  decision on the claim, especially if that decision

23  was that there was a partial non-coverage

24  situation or a complete non-coverage situation,

25  that that would be reviewed with the immediate

1    supervisor.

2    Q      Okay.   Thank you.

3            For claim representatives, I think

4    that was -- that was Michael Johnson's title, is

5    claim representative; do I have that correct?

6    A      I believe so.  I could look at the -- I know

7    you included in your detail work product notes,

8    and I believe it would be identified there.  But I

9    believe it was a claim representative at the time

10   he was responsible for this file.

11   Q      Okay.  How do claim representatives -- or

12   whatever the appropriate name is -- how do they

13   receive their assignments?  Is that kind of

14   random?  It just goes through the list for region,

15   if you know the answer?

16   A      Yes.  When a claim is taken in -- a claim --

17   and I'll give it to you in a general sense, but

18   I'll apply it to this loss.  I believe this claim

19   came in via Westfield's call center.  It was set

20   up where that's an initial call where a -- it's a

21   call center; it's a facility where the calls come

22   in.  The information's gathered from the

23   policyholder or their representative, whoever's

24   presenting the claim.  The information is then

25   input into Westfield's claim system.

1           And, I think, to be specific to your

2    question, once that information is in there,

3    depending on where it's at in the country, it will

4    flow to that region, and there is not -- I want to

5    give you the particular answer -- when it flows

6    out to a region, it is round-robin.  It's not a

7    specific adjuster that would get it.  It would be

8    an adjuster that's sort of the next person up in

9    the rotation for that area.

10           So it wouldn't go to just somebody

11   somewhere in the country.  It would go to a

12   region, and then it would go into a round-robin

13   situation where the next person gets the claim.

14   And that's how this claim would have gotten to

15   Adjuster Johnson.

16   Q    That's really helpful, thank you.

17           Mr. Johnson, do you know what region

18   he covers?

19   A    I don't.  I would be guessing.  Based on the

20   fact that he was assigned this loss in the state

21   of Tennessee, I'm going to guess that he's in the

22   central region, which might be an area that would

23   include Tennessee, Kentucky, West Virginia, but

24   that is a guess.  I don't know the particular

25   regions for all of the various professionals.

1  Q     In handling a property claim like the one

2  that came in that Mr. Johnson handled -- and I'll

3  give you the specifics of the claim in a minute.

4  I'm just trying to get how American Select's

5  internal process works.

6         In handling a property claim, does

7  American Select have certain claim procedures and

8  protocols that the claim representatives are

9  intended to follow or look to for guidance if they

10 have questions?

11 A     When you say "when they have questions," I

12 just want to be clear.  Do you mean a question

13 about the particular claim or any question?

14 Q     Yeah.  Let me rephrase.

15        Does American Select have claims,

16 procedures, and protocols that are written that

17 provide guidance to claim representatives when

18 they're reviewing, let's say, a fire claim, as

19 opposed to a water damage claim, as opposed to a

20 tornado claim?

21 A     We don't have -- we don't have procedures.

22 We have guidelines, a general property guideline.

23 We don't have mandates or procedures.  There's no

24 playbook for, okay, if there's a fire claim,

25 here's the manual.  That's not how we approach

1  claims handling.

2         The claims professionals -- and I

3  can't speak to their compendium of their training,

4  but obviously, we bring people in that have

5  experience.  We also train people internally for

6  the purposes of handling claims.

7         But to be specific, no, there is not

8  a -- there's not a white paper that addresses

9  here's a water claim and here's how you handle it,

10 or here's a fire claim and here's how you handle

11 it.  There are general guidelines.

12        And obviously, we rely on -- the

13 reason we still have claim professionals versus

14 just a computer is we rely on people to use their

15 judgment and their communication skills and

16 abilities to apply that to handling a property

17 loss.

18 Q    Absolutely.

19        Those property guidelines you

20 mentioned, are those written?

21 A    They are.

22 Q    Okay.  Are they accessible through y'all's

23 software that you use to manage claims?  Or are

24 they accessible a different way?

25 A    They're not part of the claims management

1  system.  The claims management system is a

2  specific, you know, software tool.  They are

3  available to the claim professionals at Westfield.

4  Currently, those would be available -- the company

5  can provide them, and you can see them in print as

6  a professional, but we have an intranet, and

7  that's where they would find references to the

8  property guidelines.

9  Q     Do you know how often they're updated?

10  A     Every year, and then if there is something

11  of -- this is poor terminology, but if there's

12  something of significance that would change in a

13  venue, for example, if there was a new statute

14  that changed the way we needed to address a claim

15  matter, that would get addressed in real-time and

16  then be incorporated into the following -- in an

17  official way -- or a formal way, I guess I should

18  say, in the next evaluation period.

19  Q     All right.  I'm going to request as

20  late-filed Exhibit 2 only the portion of the

21  property guidelines that would be applicable to

22  this claim.  So whether that's a section that

23  applies to Tennessee, or if there's a section

24  that's applicable to water damage.

25              If there's any required

confidentiality or nondisclosure agreement so that

you know I'm not going to share this with State

Farm or anybody else, please let your counsel know

and we're happy to agree to it.

A    Okay.

Q    And only for the year 2019.

A    Okay.

Q    Since that is when this claim came in, to

keep this as narrow as possible.

          (Late-Filed Exhibit 2.)

BY MS. FISHER:

Q    All right.  Mr. Hall, one question -- I'm

asking it generally, but obviously, it applies to

what we'll be discussing here on behalf of the

Griffins.  Does it require the permission of a

supervisor for an adjuster to hire an engineer to

inspect a property?

A    Generally, yes.  For an adjuster, in this

case, Michael Johnson, as a claim professional, I

believe he does need to request -- when I say

"need," I think I'll qualify that by saying, you

know, my experience with our staff, including

Mr. Johnson, who is somebody that I supervised for

a number of years, is that he is an experienced

adjuster.  I don't know, but I'm guessing a

1 20-plus-year adjuster.  While he has the skills

2 and ability to determine when an engineer may be

3 needed on a loss that he would take -- my

4 experience with him is that he would have

5 requested a discussion with the supervisor to talk

6 about whatever issue was to be evaluated.

7 So -- but formally, if he was going to

8 hire an engineer here, I have no reservations

9 saying he would have discussed that with a

10 supervisor before doing so.

11 Q    But for someone to hire, say, just kind of

12 your general contractor to go out and take photos

13 and put together an estimate, that wouldn't

14 require permission of a supervisor; is that

15 correct?

16 A    It would not.  And if I might add, you had

17 asked earlier, in this case, while I'm completely

18 unfamiliar with them, the John H. Allen Company is

19 the company that did inspect this loss on behalf

20 of Westfield at our request, and that happened

21 through the Crawford Connection program.

22 But to your point, no, the adjuster

23 would have had the ability to retain -- I want to

24 be careful.  I don't want to say retain John Allen

25 because that is a round table as well, meaning

1  when you make a request to Crawford, you don't

2  know who you're going to get.  So they weren't

3  necessarily requesting John H. Allen, but they

4  were requesting that the program -- the vendor

5  partner provide somebody to us to assist with the

6  inspection.

7  Q    And the relationship with Crawford &

8  Company, is that just in a region of the country,

9  and then you have someone analogous to go in other

10  parts of the country?  Or is Crawford & Company

11  able to provide that service in all 21 states that

12  you said American Select is operating in?

13  A    I don't know if they provide -- if the

14  Crawford Connection is available in all of the

15  states or not.  I don't know the answer to that.

16  Q    And I'm sure there are some claims, though I

17  would suspect they're in the minority, for which

18  an in-person inspection is not required where the

19  claim representative, based on speaking to the

20  insured and getting information from the insured,

21  maybe if it's a particularly small claim, is able

22  to adjust the claim for them without using

23  Crawford Connection or something analogous.  Is

24  that an accurate understanding?

25  A    I believe that is accurate.  There are

1  claims that are what I would consider a fast-track

2  claim, where they're straightforward.  A

3  policyholder, you know, presents maybe with an

4  estimate, and the coverage is clear, and the

5  loss -- there's not a personal inspection

6  conducted.

7  Q    Now, I'd like to go into specifically

8  talking about Claim Number 00010959, which we've

9  touched on just a little bit so far.

10          So Jack Michael Johnson, who we've

11  referred to as Michael Johnson, was the claim

12  representative assigned to this claim; is that

13  correct?

14  A    That's correct.

15  Q    And was he assigned to the claim from start

16  to finish?  Or did it ever transition to anybody

17  else or get transferred to him?

18  A    I can look at the notes, Attorney Fisher.

19  There may have been -- this claim may have been

20  assigned initially to an inside property group,

21  which Michael was part of, and then transferred to

22  him.  I can't -- for some reason, off the top of

23  my head, I think it might have been assigned to

24  somebody and transferred very quickly to him.  I

25  could be wrong on that; he may have had it day

1   one.  But he was clearly the primary adjuster on
2   the file.
3   Q      Understood.
4            Does he still work for American
5   Select?
6   A      Yes -- Mr. Johnson?
7   Q      Uh-huh.
8   A      Yes, he does.
9   Q      And you mentioned earlier that you actually
10  personally supervised him for a number of years;
11  is that correct?
12  A      That is correct.
13  Q      And then Todd Boose, B-o-o-s-e, at least at
14  the time of this claim in 2019 through 2021, was
15  Michael Johnson's supervisor; is that correct?
16  A      That is correct.
17  Q      I saw on an e-mail signature his title --
18  Todd Boose's title is property complex claims unit
19  leader.  Does he still hold that title today?
20  A      He does.
21  Q      Do you know how long he's been with American
22  Select?
23  A      Nearly 35 years as of today.
24  Q      Is he still supervising Michael Johnson, if
25  you know?

1  A     I believe there's been a transformation,

2  some territory movement in the property group.  I

3  don't believe he supervises Michael Johnson at

4  this time.

5  Q     Okay.  And I had your name in the file, so I

6  know all about you.

7          Tell me who Kevin M. Adams is.  I saw

8  his name show up in the claim file, but I didn't

9  see what his title was or his involvement.

10  A     I'm not sure what Mr. Adam's title is.

11  He -- he -- I'm trying to think.  I don't know

12  exactly what his title is.  He's a supervisor

13  similar to myself on claim matters -- on

14  litigation matters.  I don't recall his exact

15  title at this time.  From review of the file, his

16  involvement would have been after -- certainly

17  after litigation was instituted in the matter.

18  Q     Okay.  So he would have been involved

19  post-litigation; is that right?

20  A     That's correct.

21  Q     Okay.  I saw in the notes that there was

22  someone who attended the EFI Global inspection who

23  was referred to in the claim notes as "Josh at

24  Westfield."  Do you know who that is?

25  A     Yes.

1  Q     Who is he?

2  A     So Adjuster Johnson, as we've discussed,

3  resides in West Virginia, and the inspection

4  obviously needed to take place in Tennessee at the

5  Griffins' home.  So when the decision was made to

6  retain the engineer -- American Select wanted to

7  have a representative present for the inspection

8  for the engineer analysis, so they tasked the most

9  local claim professional to do that.

10          And I apologize, I'm thinking -- I'm

11  trying to think of Josh.  And I saw the note in

12  the file, and his last name is escaping me, and

13  you do have my apology.

14          MR. TOMKINS:  If you don't mind, I

15  think it's Josh Parrish.

16          THE WITNESS:  Josh Parrish, that is

17  correct.  My apologies for the brain freeze there.

18          But Josh's engagement was, as I

19  understand it, to be the company representative at

20  that inspection.  My understanding from looking at

21  the file was that he attended that inspection, and

22  that was the end of his engagement or involvement

23  in this file.

24  BY MS. FISHER:

25  Q     Did he fill out any sort of, you know, notes

1    to the claim file or summary based on his

2    attendance at the inspection that were then saved

3    in the claim file?

4    A      I can certainly look at those notes if you

5    want to pull those up, Attorney Fisher.  I don't

6    recall reading a synopsis or an overview from

7    Adjuster Parrish in the file.  I know the engineer

8    obviously reported back, and then there was a

9    report generated.  But I don't believe that

10   Adjuster Parrish compiled a -- he wouldn't have

11   been requested to compile a report, but I don't

12   believe he put a report or an inspection of his

13   overview in the file.  I could be wrong.  I'd be

14   glad to look at the file notes.

15   Q      I'm not trying to be tricky.  I didn't see

16   any report in what I saw, but I know I have a

17   redacted version, so that's why I'm asking.

18   A      No.  I did not take your questions --

19               MR. TOMKINS:  As far as the

20   redactions, those were post-suit --

21               MS. FISHER:  Okay.

22               MR. TOMKINS:  -- portions, so we

23   didn't redact anything pre-suit.

24               MS. FISHER:  Okay.  Thank you,

25   Mr. Tomkins.  I wouldn't expect it, but I always

```
1   like to check.  Sometimes --
2                THE WITNESS:  And, Attorney Fisher,
3   I'll just confirm.  My recollection is usually
4   pretty good.  I don't remember seeing -- and I
5   could look at the notes, but I do not believe that
6   you're missing anything.  I don't believe that
7   Adjuster Parrish provided -- you know, again,
8   documented the file regarding anything that he
9   viewed.  His role there was really to be the
10  company -- to attend the inspection as a courtesy
11  for the policyholder, more or less.  The engineer
12  was there to do his work, of course.
13               MS. FISHER:  Absolutely.
14  Q    Josh Parrish, is that P-a-r-r-i-s-h?
15  A    I believe so, yes.
16  Q    Is he based out of Memphis or Nashville or
17  somewhere else?
18  A    If it's okay with you, I can look to give
19  you that.
20  Q    Okay.
21  A    But I don't want to look at anything if you
22  don't want me to.
23  Q    Well --
24               MR. TOMKINS:  And I can answer if you
25  want me to.
```

```
1              MS. FISHER:  Okay.

2              MR. TOMKINS:  Nashville does not have

3    a formal office.  They work out of their homes,

4    but he is a Nashville-based guy.  I think Josh may

5    be in Hendersonville or somewhere, but the

6    immediate Nashville area.

7              MS. FISHER:  Okay.  Thank you,

8    Mr. Tomkins.

9    Q     Mr. Hall, you mentioned earlier that you

10   have supervised Michael Johnson.  Have you ever

11   supervised Todd Boose before?

12   A     Yes.  And I'll qualify that.  In a

13   litigation environment, there -- if Todd was

14   supervising a file that went to litigation, when

15   it goes to litigation, ultimately, the people that

16   are involved in the file are reporting to me on

17   those matters.  So there are situations of that

18   nature where Todd would be reporting to me, yes.

19   Q     You mentioned your claim management system.

20   What is that software called?  Or is it simply

21   called Claim Management System?

22   A     Claim Center is the claim management system;

23   that is the name.  It's -- I guess it's just Claim

24   Center Software.  I don't know who the actual,

25   like, behind-the-scenes label would be.
```

1  Q     We need to get some more creative software

2  developers out there.

3        Can American Select employees only

4  access Claim Center from their computers?  Or can

5  they also access it from, like, a phone or iPad if

6  they're out in the field?

7  A     I have access to Claim Center, for example,

8  and the only method for a claim professional to

9  have access to the claim management system is

10 through their assigned company -- I work from a

11 laptop.  I'm going to guess there may be a few

12 people today that still have access to, you know,

13 a stationary computer, but it would be very few.

14        But each person has a laptop, and

15 their access is through their laptop.  You can't

16 get to our claim management system via a

17 portable -- your cell phone, for example.  Even if

18 you have a company cell phone, it does not tether

19 to the claim management system.  And when you do

20 join the claim management tool, you must do that

21 through your assigned computer using your code to

22 get to the system.  It's not a -- you can't get to

23 it through a home computer or a cell phone, for

24 example.

25 Q     Got it.  Thank you.  I asked that question

1  so I can understand how people are able to access

2  it to make notes or upload photos or documents.

3          All right.  Let me pull up the

4  document that's been provided in advance.  It's

5  "4-Claim Notes."  That's the title of the PDF

6  document, and it's 41 pages.  I'll share it on my

7  screen, but you're welcome to look at it

8  independently as well.

9          I'm not going to go through every

10  single page with you; that would be far too

11  painful.  But there are a few notes in particular

12  I wanted to ask you questions about.  First, let's

13  go ahead and make this an exhibit to your

14  deposition.  I think this is Exhibit 3, the claim

15  notes.

16          (Marked Exhibit 3.)

17  BY MS. FISHER:

18  Q    And I'm going to start toward the end of the

19  document because, chronologically, that's the

20  earliest, and then go from there for the couple

21  notes I have questions about.  So I'm on page 33

22  of 41 of the PDF document.  I'll zoom in here so

23  we're not losing our eyesight by looking at it.

24          This is a note inputted into the

25  system by Jack Johnson dated 12/31/2019.  The note

1  starts out, "Status:  Received a LOR from Morgan &

2  Morgan, Griffin, William & Billie vs. Westfield

3  Insurance Company.  Letter ok's us to contact the

4  insured directly.  Contacted Mr. Ins" -- I believe

5  that stands for Mr. Insured -- "to discuss.  He

6  advised back in July, he had a water leak in the

7  bathroom, which caused damage to the floor and

8  vanity.  He cleaned and dried himself."

9           I'm going to stop there because that's

10  what I have questions about.  Did I read that part

11  of the claim note correctly?

12  A     It appears so.

13  Q     The portion I've read -- and you're welcome

14  to read the rest of it as well -- but the portion

15  I've read where it's noting what Mr. Insured

16  advised to Jack Johnson at American Select.  He

17  mentions that "in July, he had a water leak in the

18  bathroom which caused water damage to the floor

19  and vanity.  He cleaned and dried himself."

20           Do you see anything in the note that

21  indicates Mr. Insured told American Select this

22  was a supply line?

23  A     I do not.

24  Q     Okay.  Thank you.

25           I'd like to go to page 31 of 41 of the

1  PDF.  This is a note dated 1/23.  This isn't on

2  page 31, my apologies -- oh, yeah, it starts on 31

3  and goes to 32.  So I'm on page 32.  You can see

4  the note starts on page 31 and goes down to 32,

5  the notice from Jack Johnson on January 23, 2020.

6  I'll make that a little larger for you.

7          The -- about halfway through the note,

8  the paragraph starts, "Called Mr. Insured back.

9  He advises his brother fixed the pipe, which was

10  leaking in the joint where the PVC goes into the

11  cast iron.  He wrapped the joint where the two

12  meet and has not had any problems since that

13  time."

14          Did I read that correctly?

15  A    It appears you did.

16  Q    And then it says, "Called contractor,

17  Phillip Allen, to discuss the pipe in question.

18  Phillip advises there did not appear to be any

19  problem with leakage.  Mr. Insured had told him

20  the problem had been fixed.  We reviewed the photo

21  together.  Phillip advises it appears to be solder

22  at the joint."  I'll stop there.

23          Did I read that correctly?

24  A    You did.

25  Q    All right.  Do you know if cast iron pipes

```
1   are or were ever used for supply lines?
2   A     I wouldn't -- I can't guess whether they
3   were ever used for supply or not.  I would be
4   guessing.
5   Q     Okay.  And I'm not asking you to do that.
6              Reading on, it says, "Phillip advises
7   the insured is a well-known public adjuster in the
8   area and feels this loss will be a problem to
9   settle.  Phillip will apply d-e-p-r" -- I believe
10  that stands for depreciation -- "to the estimate
11  and send through Xact" -- I think that means
12  Xactimate -- "as job not sold."
13             Did I read that correctly?
14  A     You did.
15  Q     Did I understand those abbreviations
16  correctly?
17  A     The abbreviation you read in that piece was
18  d-e-p-r; correct?  And you said that was
19  depreciation, which I agree with.  And the
20  "through X-a-c," that would be Xactimate or Xacta,
21  as some people call it.  But I believe those were
22  the two you referred to, and I agree with your
23  translation.
24  Q     Here's my question:  Did the fact that
25  Phillip Allen told Michael Johnson that the
```

1  insured was a well-known adjuster impact how

2  Mr. Griffins' claim was handled at all?

3  A    I don't believe so.

4  Q    This may be a bit of an unusual situation,

5  but, you know, you have quite a bit of experience

6  and years in the industry, so maybe it's not that

7  unusual if you do it long enough.  But in your

8  experience, if the person who's sent out to do an

9  inspection and write the estimate knows the

10 insured and maybe, you know, doesn't get along

11 with the insured, would that be a point at which

12 someone different would be assigned to the claim

13 just to ensure impartiality to the insured?

14 A    I understand your question, Attorney Fisher.

15 I wouldn't say from that note that I could infer

16 that Mr. Allen's information that he offered to

17 the adjuster is anything other than information

18 being provided.  He wrote an estimate, as you

19 know.  It appears he captured the damages that his

20 photos show, so there's nothing here in this

21 situation that would suggest to me that this file

22 would have needed to be reassigned to anyone at

23 this point.

24 Q    Understood.  Thank you.

25          I'm going to look at page 31 now.

1   This is a note on 2/4/20, which is right above the
2   one we were looking at.  It was entered by Derek
3   Groff, G-r-o-f-f.  Do you know who that individual
4   is?
5   A    Yes.  Mr. Groff was an inside unit leader at
6   the time this file first came in.  And when the
7   claim file was set up and initiated, he was the
8   supervisor.
9   Q    So he was in Mr. Boose's role at the time
10  the claim was first set up?
11  A    No.  He was supervising an inside property
12  group, which Mr. Johnson was part of, and so he
13  was tasked with supervising Michael in respect to
14  this claim.
15  Q    Okay.  Does he still work for American
16  select?
17  A    He does.
18  Q    This note says, "Reviewed file this date
19  with adjuster.  Damages identified during
20  inspection by CC contractor.  Damages are being
21  accepted as water damage due to toilet overflow.
22          "Estimate prepared, appears insured
23  will not be utilizing the preferred therefore,
24  adjuster to collaborate estimate, apply
25  depreciation appropriately, and proceed with

1  payment of covered damages to NI and Law Firm."

2           Did I read that correctly?

3  A     You did.

4  Q     And the abbreviation in the first section

5  "CC contractor," does that "CC" stand for Crawford

6  Connection?

7  A     I believe it does.

8  Q     Okay.  And then, the last line there when it

9  says "payment of covered damages to NI and Law

10 Firm," I imagine that maybe those initials were

11 transposed, and that should be "IN" for insured?

12 A     I think that this supervisor, "NI" is -- he

13 has it that way for named insured.

14 Q     Got it.  Great.

15           Do you see any reference to a supply

16 line noted in this note that we just read by

17 Mr. Groff on February 4, 2020?

18 A     I do not.

19 Q     And then a little further up on the same

20 page, page 31 of 41 of the PDF document we're

21 looking at, there's a note by Jack Johnson; we've

22 been referring to him as Michael Johnson, but it's

23 the same person.  On February 19, 2020, it says,

24 "Status:  The cause of loss is a leaking pipe

25 joint, no subro to collect.  Closing subro to

1  close the file."

2          Did I read that correctly?

3  A      You did.

4  Q      Do you see any reference in that note to a

5  supply line?

6  A      I just see the reference as you read it,

7  "leaking pipe joint."

8  Q      And this note regarding subrogation would be

9  an inquiry to see if maybe another entity was

10 responsible; right?  So if a hot water heater

11 manufacturer had made an error, subrogation could

12 go after the hot water manufacturer for their

13 mistake.  That's why subrogation would be looked

14 into for an insurance claim; am I correct in that

15 understanding?

16 A      Generally, yes.

17 Q      Page 29 of 41 is the next note I'd like to

18 draw our attention to.  And I only have two more

19 from the claim file, I think, for us to look at.

20 Two or three.

21          Page 29 of 41, a note by Jack Johnson

22 on 1/13/2021.  Bear with me one moment.  All

23 right.  Here's the note right here, page 29 of 41,

24 that 1/13/2021 note.  The second paragraph of it

25 says, "Anthony" -- that's the name of the EFI

1   engineer -- "Anthony advises he's aware of the

2   insured.  He advises the insured is not a public

3   adjuster.  Anthony advises he is not allowed to

4   get his public adjuster's license for an unknown

5   reason.  Anthony advises the insured acts as a

6   contractor and takes everything to the appraisal

7   process at the beginning of the claim.  Anthony

8   advises this will be a hard loss to settle with

9   the insured."

10          Did I read that correctly?

11  A      You did.

12  Q      Did this status report from the structural

13  engineer who was hired to assess the insured's

14  home, did that impact how American Select

15  investigated and handled the Griffins' claim?

16  A      Again, my answer will be consistent with

17  what we talked about earlier, Attorney Fisher.  I

18  see the note that you read.  My answer is it

19  didn't impact the adjuster's opinion at all, and I

20  base that on the fact that the adjuster makes no

21  further reference to it anywhere in his claim

22  handling.  So my answer is I don't believe it

23  impacted the claim handling at all.

24  Q      Does American Select use structural

25  engineers who work for companies other than EFI

1  Global?  Or are all the structural engineering

2  assignments assigned to EFI Global, if you know?

3  A     We use, I would say countless would probably

4  be fair, structural engineers.  EFI, as I'm sure

5  you're familiar, is a fairly large company that

6  provides a multitude of forensic-type experts,

7  including structural engineers.

8             But to answer your question, no,

9  Westfield and American Select specifically

10  assigned claims to many different structuralists.

11  It depends on where the loss is, you know,

12  state-wise and availability-wise.  But the answer

13  is no.  There are many structuralists used in the

14  course of daily business in the claims

15  environment.

16  Q     Got you.

17            Do you know if American Select uses a

18  firm called Donan?

19  A     I'm familiar with Donan, and yes, I'm sure

20  that we have.  I'm sure that there are structural

21  analyses that have been done by Donan.

22  Q     And a similar question to the one before but

23  for a different person since now we're talking

24  about the structural engineer.  Once this status

25  was reported back to Michael Johnson at American

1   Select, do you think it would have been prudent,

2   or would he even have had permission to maybe hire

3   a different engineer who didn't personally know

4   the insureds just to ensure that the inspection

5   was done by someone who was impartial?

6   A    I don't know if that thought process took

7   place.  I couldn't answer that.  I know from the

8   file that there was no contemplation of seeking a

9   different expert.  And if you're asking my opinion

10  from reading the file is the reason it wasn't

11  undertaken is the engineer's report seemed quite

12  straightforward, you know, based on the evidence

13  that was presented at the Griffins' home.

14  Q    On this same page, 29 of 41, there's a note

15  right above that dated January 14, 2021, noted by

16  Michael Johnson.  It says, "Status: Called Draingo

17  Plumbing to discuss their plumbing report and

18  estimate of 9,952 to re-plumb sanitary drain

19  lines.  Secretary will give the manager our

20  contact info to return the call."

21          Did I read that correctly?

22  A    Yes, you did.

23  Q    And I didn't see it in the call notes.  I'm

24  just asking you in case there's something I

25  missed.  Do you know if Michael Johnson or anyone

1  else at American Select was able to speak to the

2  plumbers at Draingo before issuing their coverage

3  letter?

4  A     My familiarity with the file does not

5  indicate a conversation documented in the claim

6  file.  Does that mean there was not such a

7  conversation?  I can't say that a conversation

8  didn't take place, but it is not documented in the

9  file.

10  Q     Similar question.  I'm just asking because I

11  know you've reviewed the file as well.  I don't

12  see where any plumbers, other than those from

13  Draingo, inspected the Griffins' property in

14  connection with this claim.  Are you aware of any

15  other plumbers other than those at Draingo who

16  inspected the Griffins' property in connection

17  with the investigation of this claim?

18  A     I am not aware of any -- I could not say yes

19  or no.  I'm not aware of any.

20  Q     Of any plumbers other than Draingo, who

21  inspected?

22  A     That's correct.  The only plumbers that I

23  understand that were out there were the folks from

24  Draingo.

25  Q     Do you think it would have been helpful if

1 Michael Johnson had spoken to the plumbers at

2 Draingo before issuing a coverage letter in this

3 claim?

4 A    Actually, no.  I don't think it would have

5 changed the coverage decision.

6 Q    And that's a slightly different answer than

7 my question.

8          Do you think it would have been

9 helpful for Michael Johnson to have spoken to the

10 plumbers at Draingo prior to issuing a coverage

11 letter in regards to this claim?

12 A    I don't think it would have impacted the

13 claim had he spoken to them.  And the reason for

14 that is the -- the leak was said to have been

15 repaired and was not -- there was no leak at the

16 time that this conversation is taking place.  So I

17 don't know that talking to the plumber would have

18 been helpful.  It's -- that's my impression.

19 Q    We're still on page 29 of 41.  Michael

20 Johnson, on February 18, 2021, summarizes the

21 engineer's report starting on page 28 and going

22 down to 29.  It starts by saying "Status" on

23 Page 28.  Under that, it says, "We have received

24 the engineer report."

25          It says, "Conclusion and

1   recommendations.  The analysis of available

2   evidence related to this project supports the

3   following."   And then, under line item 1, it

4   says, "The water supply line to the toilet

5   reportedly leaked for approximately two days at or

6   about the date of loss, expelling water on the

7   bathroom and hallway floors."  I'll stop there.

8              Did I read that correctly?

9   A     You did.

10  Q     So this is the engineer's report in February

11  2021 regarding a loss that occurred in July 2019.

12             Do you see anything in the file before

13  the engineer's report that referred to this loss

14  as coming from a supply line?

15  A     My recollection is -- well, I don't believe

16  it was one of the notes that you referenced,

17  Attorney Fisher, but there was some question

18  regarding what or where the water emulated from.

19  This note that you just referenced is the first

20  specific note that says supply line, to answer

21  your question directly.  That is the first

22  reference that I am familiar with that says supply

23  line, but I believe there's a reference to some

24  uncertainty about where the water came from prior

25  to this.

1   Q      Got it.

2            And the leak -- I think we agree the

3   leak was not still ongoing in January and February

4   of 2021; right?

5   A      I agree.

6   Q      So this -- this statement regarding a supply

7   line that the engineer put in his report was not a

8   statement based on a firsthand observation; right?

9   A      Well, my -- my understanding is that the

10  engineer -- this numbered item that you have on

11  the screen now on page 61 of the work product

12  notes, that is from -- unless I'm wrong, I believe

13  that's a direct quote from the engineer's report.

14  And I believe that the engineer's report sets out

15  that that's what he was told by Mr. Griffin during

16  his inspection.

17  Q      Yes, thank you.  And we can look at that

18  report as well.  I was just confirming that, you

19  know, firsthand is when you see something like

20  when I walk out from my office, and I actually see

21  a car wreck happen in front of my office.

22           If the engineer is reporting this as a

23  supply line leak, he's having -- he's getting that

24  information from somewhere that is other than a

25  firsthand observation because it was no longer

1  leaking in January and February 2021.  Can we

2  agree on that?

3  A     Agreed.

4  Q     Do you know if -- and my apologies.  How do

5  you pronounce the engineer's last name?

6  A     I'm going to say Florio (pronouncing), and

7  know that I'm wrong.  I'm not sure.  I don't know

8  the man at all.  I've never spoken with him, so I

9  apologize.  I just think it's Florio or Flirrio

10 (pronouncing).

11 Q     He has been on my files before, so I should

12 know how to fully pronounce his name at this

13 point.

14        Do you know if Mr. Firriolo is a

15 licensed plumber or if he works under the license

16 of a licensed plumber in Tennessee?

17 A     I don't know.

18 Q     Okay.  There was one other thing I noted

19 from these claim notes that I wanted to ask about.

20 There was one -- I'm on page 13 of 41.  This

21 refers to check -- or yeah, different people in

22 their roles as it relates to this claim.  The one

23 at the top is AFX Research, LLC.

24        Do you know who this is and what they

25 did in this claim?

1   A     Yes.  AFX is a title search company, and

2   they would have been employed in this claim.  This

3   would have been a request by Adjuster Johnson to

4   have them do a title search confirming the

5   ownership, you know, the interest on the property.

6   My understanding is that that stemmed from -- I

7   believe Mr. Griffin had referenced the purchase of

8   the home being in close proximity to the loss, and

9   the policy was, I believe, in its first 30 days.

10  So the title search -- AFX would have completed a

11  title search on behalf of American Select to

12  confirm the interests.

13  Q     Got it.  Thank you.

14          Mr. Hall, I -- for full transparency,

15  I'm on page 9 of 15 of my outline.  I know you've

16  graciously been going for 90 minutes.  Are you

17  okay to keep going?  Or would you like to take a

18  break?

19  A     I'm okay.  Unless someone else needs to take

20  a break, we can continue.

21          MS. FISHER:  Mr. Tomkins?  Ms. Gale?

22          MR. TOMKINS:  Can we take just about a

23  10-minute break?

24          MS. FISHER:  Yeah, absolutely.  Do you

25  want to come back at 2:40?

1    MR. TOMKINS:  Yeah, that would be

2    fine.

3    (Off the record.)

4    BY MS. FISHER:

5    Q    Mr. Hall, I'm going -- I have a few more

6    questions from the documents that were produced as

7    part of discovery that I'd like to go through with

8    you, and you can just answer them to the best of

9    your ability.

10    There were some photos that were

11    provided in the claim file.  I have titled them

12    "8-Griffin Preferred photos."  I'll share my

13    screen with you now.  It's seven pages.  It's a

14    photo sheet with J.H. Allen Company listed on it.

15    Do you -- do you know who took these

16    photos?

17    A    My understanding is that the inspection by

18    the John H. Allen Company was done by Phillip

19    Allen.  And I make that statement based on the

20    estimate that was prepared and the -- some file

21    discussions between the adjuster and he.  But it's

22    my understanding that these were photos that would

23    have been taken during the inspection of the home

24    by the Allen Company.

25    Q    Okay.  That was my assumption as well, but

1  thought I'd ask you in case you had any greater

2  institutional knowledge than I did.

3          And here's one photo on page 7 of 7

4  that is -- well, hang on.  Yeah, we can look at

5  this one.  Does this photo on page 7 that I'm

6  screen sharing with you that shows the floor

7  insulation -- and you may or may not be

8  particularly familiar with materials used in

9  plumbing drainage systems, but does this photo

10  appear to show both cast iron pipe and PVC?

11  A      Well, it does show both types of materials.

12  The white piping material -- the solid white that

13  we see in the top photo is schedule 40 PVC, and

14  that particular line that we're looking at right

15  there would be part of what's called the DWV

16  system of this home.

17          The black and white piping that we see

18  is actually -- it's undetermined, you can't

19  determine from this photo, but that is black

20  insulation, and then it is then taped with white

21  tape.  And then behind that pipe, which we see a

22  pipe going in a vertical manner, that is the main

23  drain line to what I would strongly believe to be

24  the commode going up through the floor to the

25  commode where your hand is right now, and that

1  appears to be a cast pipe, what I think folks have

2  been referring to today as cast iron pipe.

3  Q    Okay.  And I see 14 photos that were

4  provided as this photo sheet from the

5  John H. Allen Company, and we believe they were

6  taken by Phillip Allen.  Do you know if Phillip

7  Allen took any videos when he was at the Griffins'

8  home?

9  A    I do not know if he took any video.  I would

10 presume if he had, we would have that video, and

11 we don't, so I'm going to suggest that there is no

12 video.  But I -- what I do know is that these

13 photos are the same photos that I've seen,

14 Attorney Fisher, in the claim file.

15 Q    Do you know if Phillip Allen is a licensed

16 plumber or if he works under a plumber who's

17 licensed in the state of Tennessee?

18 A    I don't know the answer to that.  I don't

19 know if he's a licensed plumber.

20 Q    There's a document that I've provided in the

21 link in advance of today that's an e-mail that's

22 titled "Response to the attorney loss is covered."

23 This was provided in the claim file.  I'll share

24 it -- oh, my apologies.  Those photos, I'd like to

25 mark those as exhibit to your deposition.

1      I believe it's Exhibit 4; is that

2  correct, Ms. Gale?

3          DEPOSITION OFFICER:  Yes.

4          MS. FISHER:  Since we've talked about

5  them, we'll go ahead and make sure they're marked.

6          (Marked Exhibit 4.)

7  BY MS. FISHER:

8  Q     All right.  I'm sharing this e-mail that was

9  provided in the document production by your

10  attorney as part of the discovery in this case.

11  This is an e-mail from Jack Michael Johnson on

12  February 4, 2020.  So this was shortly after the

13  claim was initially reported in December of 2019,

14  and it says, "According to our insureds, they

15  suffered a water loss as a result of an

16  overflowing drain line.  The leak was determined

17  to be in a joint where a plastic pipe is inserted

18  into a cast iron pipe below the subfloor in the

19  crawlspace, according to the insured.  The

20  insured's brother sealed the joining where the two

21  pipes join together to correct the problem.

22  Accidental discharge or overflow of water is a

23  covered loss.  Thank you, Michael."

24          Did I read that correctly?

25  A     You did.

1    Q      And Michael Johnson, when describing a water

2    loss, he refers to "a water loss as a result of an

3    overflowing drain line"; correct?

4    A      Result of an -- yes.

5    Q      And then a plumbing system, I guess, we'll

6    just say for a residential property because I

7    suppose commercial properties can get infinitely

8    more complex even though it comes down to the same

9    thing.

10            But for a plumbing system, you have

11   supply lines, which bring water into a home, and

12   then you have drain lines, which take away

13   wastewater from sinks, dishwashers, washing

14   machines, bathtubs, showers, commodes.  Is that a

15   fair understanding or a fair restatement of how

16   plumbing systems are usually set up in a

17   residential property?

18   A      In simplest terms, yes.

19   Q      So when someone like Michael Johnson in

20   February 2020 is referring to the water loss as

21   being a result of an overflowing drain line, he's

22   clearly referring to a drain line that's draining

23   water and waste away from the property as opposed

24   to a supply line; is that fair to say?

25   A      Based on this note, I believe that would be

1   fair to say.

2   Q      Mr. Johnson, you said, has been doing this

3   for over 20 years, and he certainly knows the

4   difference between a drain line and a supply line;

5   right?

6   A      I believe he does.

7   Q      And here, too, he mentions a plastic pipe

8   inserted into a cast iron pipe.  We saw in the

9   picture you and I just looked at in Exhibit 4 both

10  plastic pipe and cast iron pipe in the crawlspace

11  under the insured's home; is that correct?

12  A      We did.

13  Q      And then following Michael Johnson's e-mail

14  of February 2020 in which he says accidental

15  discharge or overflow of water is a covered loss,

16  American Select, in fact, did issue payment to the

17  insureds because this was a covered loss; right?

18  A      The accidental discharge, yes, was covered,

19  and I believe in mid-February, an estimate and

20  check were compiled for the accidental

21  discharge-related damages, yes.

22  Q      Okay.  All right.

23          Let's look now at the -- what is

24  referred to as a claim determination letter.  So

25  the document I provided to you is in the folder I

1 provided in advance of today.  It's "5-2021.03.17

2 Claim Determination."  And I'll share my screen.

3          And this is a letter from Westfield

4 sent by e-mail to -- it actually says The National

5 Law Firm, which I don't know what that is.  But I

6 think it means The Nation Law Firm, which we

7 discussed earlier today, is part of Morgan &

8 Morgan.  This is a six-page letter signed by

9 Michael Johnson, or it has his signature block at

10 the end.

11          Have you seen this coverage letter

12 before, Mr. Hall?

13 A     I have.

14 Q     Okay.  Let's go ahead and mark this

15 Exhibit 5 since we've been talking about it.

16          (Marked Exhibit 5.)

17 BY MS. FISHER:

18 Q     It looked to me in the file like Mr. Johnson

19 consulted with his supervisor, Mr. Boose, prior to

20 finalizing this letter; is that your understanding

21 as well?

22 A     It is.

23 Q     Do you know if anyone else at American

24 Select assisted Mr. Johnson or assisted on the

25 language or the determination of this letter prior

1  to sending it to the Griffins?

2  A    I don't know for certain.  I don't see that

3  other people were consulted in the claim file.  So

4  from the claim file, I see no other people

5  involved, but I don't know for certain.

6  Q    Okay.  I'm happy to scroll through, but does

7  this -- this appears to be a true and correct copy

8  of the final version of the letter that was sent

9  to The Nation Law Firm?

10 A    I believe it is a correct copy.

11 Q    Okay.  I'm going to direct our attention to

12 page 2 of 6 -- the bottom of page 2 of 6, and I'll

13 go ahead and highlight it.  I'm going to read it

14 and then ask you a question about it.

15           It says, "Based on our investigation,

16 American Select feels that the insured has been

17 fully compensated for repairs necessary to the

18 bathroom as a result of the water leak which

19 occurred on or about July 26, 2019.  Our prior

20 estimate and subsequent payment included costs to

21 replace the vinyl flooring, underlayment, vanity,

22 and insulation, as well as repair the hardwood

23 flooring in the hallway outside the bathroom.

24 These damages exceed the scope of damages

25 determined by the engineer to be a result of the

1  commode supply line leak.  Therefore, no further

2  consideration will be given the damages in the

3  bathroom outside any potential recoverable

4  depreciation based on our original estimate that

5  may be presented at the time the repairs are

6  completed and proper supporting documentation is

7  submitted."

8         Did I read that correctly?

9  A     I believe you did.

10 Q     And to the best of your knowledge, is this

11 still American Select's position regarding

12 coverage for this claim?

13 A     Is this still an accurate reflection of our

14 coverage decision on the claim?

15 Q     Yes.

16 A     Well, I believe it's an accurate description

17 of the coverage decision that was made on the

18 claim.  I think that I would suggest that

19 discovery to date continues to support the outcome

20 of this decision, but we've learned some things

21 that may suggest that there are differences in

22 where this water may or may not have come from.

23 Q     All right.  And so, I guess I'll just go

24 ahead and address the issue I've very clearly been

25 asking you questions about today.

1          If it's determined that the water loss

2     that was reported was indeed from a drain line, as

3     Michael Johnson stated in his e-mail of

4     February 2020, and as it appears other

5     documentation indicates, would that -- does that

6     change American Select's determination regarding

7     coverage in this claim?

8     A     I think that whether the water came from the

9     drain that's been referenced as a drain, and I'll

10    take it upon myself to say the only drain that's

11    there at the floor is the commode.  You may argue

12    with me in that regard, but for the sake of what's

13    been presented and what has been made available to

14    me, it's the commode.  And so whether the commode

15    overflowed at the floor or from the commode itself

16    or a supply line leaked, while the causes of those

17    things, the leak, whether it was from the drain or

18    from a supply line, while the cause may well be

19    excluded, the accidental discharge of water is

20    covered.

21          So whether it was the drain line to

22    the commode or the supply line, the coverage

23    decision in regards to accidental discharge, the

24    accidental water damage, the water damage is

25    covered as Westfield -- American Select had

1  determined, and the payment for those damages

2  would be, in fact, covered under the policy

3  whether it was the supply line or the drain.  If

4  water emulated from one or the other, the

5  resulting water damage, then the accidental

6  discharge is covered, as American Select

7  determined in this case.

8  Q     This leads in very well.  Let's look at the

9  policy.  So the certified policy was provided in

10  advance of your deposition.  The document is

11  titled "6-Certified policy."  It's an 87-page PDF

12  document with a certification on the front page.

13  Bear with me one moment.  I'll share my screen in

14  just a minute.

15             I'm sharing with you the policy that

16  was issued to Billie and William Griffin.  It

17  says, "Date of Loss: July 26, 2019."  And on the

18  certification page, it says the policy period is

19  July 2, 2019, to July 2, 2020.  I am happy to

20  scroll through this.  Or you can look through it

21  if you have your own version, your own PDF of it

22  pulled up.  But does this appear to be an accurate

23  copy of the certified policy that was in place at

24  the time of loss?

25  A     Yeah.  Based on the certification page that

1   you're showing me, Attorney Fisher, I would say

2   that this is an accurate certified policy.

3   Without looking at every page, of course, I can't

4   guarantee it, but this appears to be the

5   certified, yes.

6   Q     Understood.  Let's go ahead and make this

7   Exhibit 6 just so it's clear to the record since

8   I'm asking you questions about it.

9              (Marked Exhibit 6.)

10  BY MS. FISHER:

11  Q     Do you dispute that this policy was in place

12  on the date of loss, July 26, 2019?

13  A     No.  It's my understanding the policy was,

14  in fact, in force.

15  Q     Let's look at page 38.  This section shows

16  which perils are insured against.  At the very top

17  here, it says, "We insure against direct physical

18  loss to property described in Coverages A, B, and

19  C."  And then, under that, it says, "We do not

20  insure, however, for loss," and then it lists a

21  series of exclusions.

22              Did I read those first two sentences

23  correctly?

24  A     You did.  I would just qualify that it

25  identifies the section to be exclusions, but then

1    it goes on to list noncovered perils.  The

2    listings here are not the exclusions.  Number 1

3    references policy exclusions and number 2 actually

4    references causes that are not covered under the

5    policy.

6    Q     Yes.  Thank you.  I appreciate that,

7    Mr. Hall.

8                  Would you agree with me that this is

9    not a named perils policy?  So by that, I mean

10   this isn't a policy that says we only cover these

11   seven kinds of loss: fire, vandalism, windstorm,

12   hail?  Would you agree with me that this certified

13   policy issued to the Griffins that we're looking

14   at now is not a named perils policy?

15   A     It is not a named perils policy.

16   Q     And then would you agree with me that

17   instead, this is what's often referred to as an

18   all-risk or an all-perils policy, which means that

19   a direct physical loss to a property is covered

20   unless it's otherwise excluded by the language in

21   the policy?

22   A     Yeah.  I would not agree that this is an

23   all-risk policy.  What I would agree to is that

24   this is a policy that covers direct physical loss

25   of property subject to exclusions, perils not

1   insured against, which is the section that you've

2   taken me to today, as well as other terms and

3   conditions.  But I would not refer to this as an

4   open perils policy.  I would refer -- or excuse

5   me, I would not refer to this as an all-risk

6   policy.  I would refer to it as an open perils

7   subject to exclusions, limitations, terms, and

8   conditions.

9   Q    Okay, open perils.  Thank you.

10          All right.  And simply because we've

11  been talking about it today, another thing I want

12  us to look at while we're here on page 38 and 39

13  is -- I believe this is a sort of interesting

14  exception to an exclusion.

15          So we just read page 38.  At the top,

16  it says, "We insure against direct physical loss

17  to property described in Coverages A, B, and C.

18  We do not insure, however, for loss:  Under

19  Coverages A, B, and C:

20  1.  Excluded under Section II exclusions, or

21  2.  Caused by:"  And then if you look over to

22  Section e, "any of the following:  wear and tear,

23  marring, deterioration, mechanical breakdown,

24  latent defect, inherent vice, or any quality in

25  property that causes it to damage or destroy

1  itself; 3. smog, rust, or other corrosion or dry

2  rot."

3          I'll direct your attention to page 39,

4  and then in the middle of the left column, it

5  says, "Exception to 2.e."  So we were just reading

6  2.e.  "Exception to 2.e: Unless this loss is

7  otherwise excluded, we cover loss to property

8  covered under Coverages A, B, or C resulting from

9  an accidental discharge or overflow of water or

10  steam from within: (i) storm drain or water,

11  steam, or sewer pipe off the residence premises;

12  or (ii) plumbing, heating, air conditioning, or

13  automatic fire protection sprinkler system or

14  household appliances on the residence premises.

15  This includes the cost to tear out and replace any

16  part of a building or other structure on the

17  residence premises, but only when necessary to

18  repair the system or appliance.  However, such

19  tear out and replacement coverage only applies to

20  other structures if the water or steam causes

21  actual damage to a building on the residence

22  premise."

23          And after that, it says, "We do not

24  cover loss to the system or appliance from which

25  this water or steam escaped."

1          It says, "For purposes of this

2     provision, a plumbing system or household

3     appliance does not include a sump, sump pump, or

4     related equipment or roof drain, gutter,

5     downspout, or similar fixtures or equipment."

6          Did I read that correctly?

7     A     I believe you did.

8     Q     So am I correct in understanding that

9     Section 2.e lists exclusions, and then there's

10    this exception to the exclusion that we find on

11    page 39 that covers the cost to tear out and

12    replace any part of the building or other

13    structure on the residence premises but only when

14    necessary to repair the system or appliance; is

15    that correct?

16    A     As it respects to an accidental discharge.

17    Q     And in the Griffins' case, there was an

18    accidental discharge of water, and it was a

19    covered loss; right?

20    A     There was an accidental discharge of water,

21    and the damages from the water were covered as we

22    spoke earlier and paid for in full.

23    Q     Let's look at American Select's discovery

24    responses.  Let's look at the Requests for

25    Admission, so that's going to be "3-Responses to

1  RFA from Plaintiff."  That's the name of the PDF I

2  shared with everyone in advance of your deposition

3  today.  It's a four-page PDF document.

4          Have you reviewed American Select's

5  responses to their Requests for Admission in this

6  case?

7  A     Not in recent time, but I'm familiar with

8  the requests that you have up.

9  Q     Okay.  Let's go ahead and make this

10  Exhibit 7 to your deposition.

11          (Marked Exhibit 7.)

12  BY MS. FISHER:

13  Q     Request for Admission Number 2 says,

14  "American Select inspected the Property prior to

15  issuing the Policy.  Admit or Deny."  And the

16  response there is "Deny."

17          Did I read that correctly?

18  A     You did.

19  Q     Is that your understanding after having

20  reviewed the underwriting file as well, that there

21  was no in-person inspection of the property prior

22  to the issuing of the policy?

23  A     That is my understanding.

24  Q     And I think we've already covered this, but

25  while I have this pulled up, I think I'll just go

1  ahead and ask you.

2          Request for Admission Number 4, on

3  page 2 of 4, says, "The Property sustained direct

4  physical damage caused by water while the Policy

5  was in full force and effect (the "loss").  Admit

6  or Deny."

7          It says, "Admit, however, it appears

8  to have been limited to damage to the vinyl

9  flooring in the bathroom."

10          Did I read that correctly?

11  A     You did.

12  Q     And I think we've already gone over this,

13  that you agree that the dwelling sustained direct

14  physical damage caused by water while the policy

15  was in full force and effect; right?

16  A     That's correct.

17  Q     All right.  Then there are a number of

18  questions that get to this next point, but I'll

19  ask you just about one of them because I think

20  I'll get the response I need.

21          So Request for Admission Number 5

22  says, "American Select was notified of the loss

23  pursuant to the terms and conditions of the

24  policy.  Admit or Deny."

25          And the response is, "Deny."

1           Did I read that correctly?

2   A     You did.

3   Q     And is it American Select's position that

4   they were not notified of the loss pursuant to the

5   terms and conditions of the policy because of the

6   policyholder's delay in reporting the loss in

7   December when the loss occurred in July?

8   A     In part, yes.  This loss was first reported

9   in mid-December, and the reported date of loss was

10  in late July, so that certainly is not a prompt

11  notice of the loss.

12  Q     Are there any other ways in which the loss

13  was not reported pursuant to the terms and

14  conditions of the policy other than not being

15  reported promptly?

16  A     Can you rephrase your question?  I want to

17  make sure I understand.

18  Q     Yeah.  Are there any other ways that you can

19  think of while we're speaking today that American

20  Select is saying the insureds did not follow the

21  terms and conditions of the policy in terms of how

22  they reported the loss?

23  A     I can't think of any as I sit here today

24  beyond the late notice.

25  Q     I was going to ask you about the

1    Interrogatories, but the only one is the question
2    about the inspection, and we've already gone
3    through that.
4            So it doesn't sound like American
5    Select is claiming that there was preexisting
6    damage to the insured's dwelling as of the date of
7    loss.  Am I correct in that understanding?
8    A    In respect to the covered loss, no, I
9    would -- I'm not aware of any preexisting damage
10   based on the evidence that's available to me.
11           If I may add, Attorney Fisher, in that
12   answer in respect to the covered loss.  As I said,
13   in respect to the claimed loss, what is being
14   claimed, the cast pipe system, based on the
15   information that's been submitted to us, there are
16   any number of reasons why the cast system itself
17   is not covered, and those would be preexisting
18   conditions to the extent that they're due to wear
19   and tear, deterioration, and obsolescence, et
20   cetera.
21           But my answer is, in regard to the
22   covered loss, there's no indication of preexisting
23   condition in the areas save the engineer's
24   reference to the cabinet.  The vanity that
25   Westfield's adjustment included, the engineer

1  disagrees that that damage is related to -- was

2  related to water.  He relates that, I believe, and

3  I can look at the report, but to be a

4  deterioration-type condition, an age and wear

5  condition.  That would be preexisting.

6  Q      Understood.  Thank you.

7           And when we were reading a few minutes

8  ago on page 38 and 39 of the certified policy

9  issued to the Griffins that was in place on the

10  date of loss, we see pretty clearly there exactly

11  the things that you might expect to see in a cast

12  iron pipe system listed in exclusion to e:  rust,

13  corrosion, deterioration, inherent vice.

14  And there's that narrow exception to the exclusion

15  provided on the following page that details when

16  tear out coverage might be granted as an exception

17  to that excluded loss.  Would you agree with me?

18  A      I'm trying to understand your question.  I

19  think what you've asked me is do I agree that

20  there are exclusions applicable to the cast pipe,

21  and while, as I qualified my answer a moment ago,

22  the cast pipe was not damaged in this -- there's

23  no -- there's not a damage claim -- claim as I

24  understand it is that the cast pipe is being

25  claimed as it needs to be replaced.

1          The cast pipe -- there was no -- this

2     claim's reported in December.  There's no leak.

3     The cast pipe isn't leaking.  The cast pipe was

4     continued to be used, and my understanding is it's

5     still being used today.  So there hasn't been a --

6     I'm struggling a bit in that the cast pipe -- I

7     don't know that any loss occurred as a result of

8     the cast pipe.  What we have was either a

9     discharge from a drain or a release of water from

10    a supply line.

11    Q     And cast iron pipe is one of the materials

12    that is used in the drain line from the commode in

13    the Griffins' house; right?

14    A     Yes, it is.  There was no cast pipe replaced

15    in regard to this claimed loss.

16    Q     Correct.  It has not been replaced, that is

17    correct.  But it's --

18    A     And I think --

19    Q     I'm sorry.  I don't mean to get us too in

20    the weeds here.  I'll let you finish answering.

21    A     Well, I think what I would add is I agree

22    that it has not been replaced as part of the

23    claim.  There was no -- at the time the claim was

24    presented, the leak had already been stopped.  If

25    the information has been reported correctly,

1  there's no ongoing water infiltration at the home.

2  The resulting water, the accidental discharge, has

3  been covered.

4         When you ask me about the pipe, I

5  guess I'm at a loss.  The pipe wasn't damaged by

6  the accidental discharge.  The pipe was repaired

7  by the -- some plumbing act by the Griffins'

8  family member.  That repair was made without the

9  exception that you just referred to as the -- I

10  believe you said it was a limited exception.  I

11  don't understand the reference or the question

12  that you asked and how that plays to the pipe.

13  I'm at a loss in that nobody -- there was no tear

14  out required to get to any pipe.  The repair was

15  made to the system.  It was not leaking, and

16  again, as I know as we sit today, it's not

17  leaking.  So maybe I misunderstood -- I apparently

18  have misunderstood your question.

19  Q    Yeah.  And happy to discuss this further,

20  but I don't think this is a question to pose to

21  you currently right now.

22  A    Okay.  Understood.

23  Q    So this morning, I received a copy of the

24  Griffins' application for insurance.  So let me

25  bring that up.  I just have a question or two to

1  ask you.

2           So, Ms. Gale, I will e-mail you a copy

3  of this.

4  Q    It's a PDF document titled "Griffin App."

5  It's seven pages.  I'll share it on the screen

6  right now as well.

7           Mr. Hall, you mentioned that you

8  looked over the underwriting materials in advance

9  of your deposition today.  Is this one of the

10 documents that you had the opportunity to review?

11 A    It is.  I am familiar with this particular

12 document.

13 Q    All right.  Go ahead and make this

14 Exhibit 8.

15           Is that correct, Ms. Gale?

16           DEPOSITION OFFICER:  Yes.

17           MS. FISHER:  All right.  We'll make

18 this Exhibit 8.

19           (Marked Exhibit 8.)

20 BY MS. FISHER:

21 Q    And on page -- so on page 3 of 7, there's a

22 notation on this page, and I'll highlight it.

23           It says, "The water supply lines are

24 copper, PEX, or CPVC."

25           Did I read that correctly?

1  A     You did.

2  Q     All right.  Copper's pretty

3  self-explanatory.  What's PEX?

4  A     It's -- in the, I guess, plumbing

5  environment or the weekend warrior environment,

6  PEX is pronounced as "pecks," and I won't pretend

7  to know the scientific name of these particular

8  materials.  But you will -- if you go to any

9  Lowe's or Home Depot, you will see PEX in a

10  variety of colors.  It's plastic pipe, but it is a

11  particular type of plastic pipe.  So it is

12  commonly used -- in today's environment, it's

13  probably as or more commonly used than copper.

14  But it is a plumbing material for supply lines --

15  well, generally, largely used in supply lines, hot

16  and cold water supply lines.

17  Q     Okay.  And then the next thing there is

18  CPVC.  Is that also a type of plastic pipe?

19  A     Yeah.  It's a particular type of PVC pipe,

20  plastic pipe.  It's not just a plastic material,

21  but it is different than PEX.  It's going to be a

22  harder, more rigid material than PEX.  PEX can be

23  snaked through -- PEX is very -- it's almost like

24  a hose, whereas CPVC isn't quite as flexible as

25  the PEX product.

1  Q     So if the water supply line, as noted on the

2  Griffins' application for insurance, is copper,

3  PEX, or CPVC, then we can say with some confidence

4  that the water supply lines are not composed of

5  cast iron pipe; is that fair to say?

6  A     I'll -- to answer your question, I think I

7  have to answer you fully.  What you're looking at

8  are the eligibility questions that are part of the

9  application process.  And so what you've pulled

10  up, by marking that box that the home is older

11  than 35 years, these dropdowns occur so that the

12  policyholder can report what type of plumbing --

13  what type of electrical, what type of plumbing is

14  there.

15           So what I can say is what the Griffins

16  reported by the markings here is that their supply

17  lines were either copper, PEX, or CPVC.  That's

18  what was reported by Mr. and Ms. Griffin.

19  Q     It got it.

20           Did you see anything in the photos

21  taken by John H. Allen Company or the EFI engineer

22  or the individuals hired by Morgan & Morgan that

23  indicate the water supply lines were made of any

24  different materials than those reported in the

25  application for insurance?

1   A       I honestly can't answer that.  If you

2   recall, when you showed me a particular

3   photograph -- maybe it was Photo 14 from the John

4   Allen report -- there was a pipe I pointed out

5   that had black insulation on it and white tape.

6   That, in my experience, is going to have been a

7   supply line that was insulated.  I have no idea

8   what's behind that insulation.  Could it be one of

9   these materials?  It could be.  Could it be a

10  different material?  I can't guess what's behind

11  that.

12  Q       Okay.  I'm rounding the corner, so unless

13  your attorney has a lot to go over, I think I just

14  have one more document, I believe, to ask you

15  about.

16          This morning I was provided a Word

17  document titled "Underwriting guidelines."  I'll

18  share it with you, but I don't think you'll need

19  to reference it.  But I'll share it with you so

20  you can if you need to.

21          Are you familiar with these

22  underwriting guidelines?

23  A       I made myself familiar with this particular

24  document in order to be as responsive as possible

25  during today's deposition, yes.

1  Q     Okay.  We'll go ahead and make this

2  Exhibit 9 to your deposition.

3               (Marked Exhibit 9.)

4  BY MS. FISHER:

5  Q     I didn't see anything in this document that

6  required an on-site inspection in order to issue a

7  policy of insurance to the Griffins.  Did you?

8  A     In this document, is there -- I want to make

9  sure I understand you.

10              Is there anything in this document

11  that says there needs to be an on-site inspection?

12  Q     Correct.  That's my question.

13  A     I'm not familiar with anything in this

14  document that requires an on-site inspection.

15  Q     Okay.  And I didn't see anything in this

16  document that required a reporting of the age or

17  the materials of a plumbing drainage system.

18              Are you aware of anything in the

19  underwriting guidelines or application that would

20  require the reporting of the age or material of

21  the plumbing drainage system?

22  A     I'm not familiar with a requirement of that

23  nature.

24  Q     All right.  Anything you recall that you

25  didn't recall when I asked you earlier?

1  A    No, I don't think so, Attorney Fisher.  I

2  don't believe so.

3  Q    All right.  We'll reserve the right to

4  reopen your deposition for the limited purpose to

5  ask you questions about any supplemental discovery

6  that's provided.  I don't think there will be a

7  need to do that, but I'm just making my record of

8  it.  If needed, if so, it would probably be very,

9  very limited in scope to either there was a

10 question about the documents that were provided

11 this morning because I haven't had a chance to

12 fully review them; although, I don't think I have

13 questions about them, or anything provided after

14 your deposition today.

15           I'll now turn you over to Mr. Tomkins

16 to see if he has any questions.

17           MR. TOMKINS:  Just for the record, if

18 there is supplemental discovery provided, we'll

19 certainly consider any requests to further depose

20 Mr. Hall or the appropriate company

21 representative.

22           As to any documents provided today, we

23 would not agree.  Those were asked for pursuant to

24 the Rule 30 to be produced today.  So to the

25 extent that there's any issue regarding the review

1  of those prior to the deposition, that would not

2  be a basis for redeposing Mr. Hall or a company

3  representative.

4            And I do not -- the words everybody

5  wanted to hear -- I do not have any questions.

6            MS. FISHER:  All right.  I think we

7  can go off the record now.

8            (Off the record.)

9            (WHEREUPON, the deposition concluded at

10  3:23 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1   STATE OF TENNESSEE  )
                        )
2                       ) SS
                        )
3   COUNTY OF SUMNER    )
```

4          I, Katherine Gale, a Licensed Court

5   Reporter and Notary Public within and for the

6   State at Large, do hereby certify that the

7   foregoing was taken at the place set forth in the

8   caption thereof; that the proceedings of said were

9   stenographically reported by me in shorthand; and

10  that the foregoing pages constitute a true and

11  correct transcription of said proceedings to

12  the best of my ability.

13          I further certify that I am neither a

14  relative nor employee nor attorney nor counsel of

15  any of the parties to this action, and that I am

16  neither a relative nor employee of such attorney

17  or counsel, and that I am not financially

18  interested in the outcome of this action.

19          WITNESS MY SIGNATURE this 17th day of

20  October, 2022.

21

22

23  _____

    Katherine Gale, CSR, RPR, LCR #420
24  LCR Expires: 06/30/2024
    Notary Public at Large,
25  State of Tennessee
    My Commission Expires:  January 31, 2024

AMENDMENT SHEET

I, the undersigned, DOUGLAS HALL, do hereby
certify that I have read the foregoing examination
and that, to the best of my knowledge, said
deposition is true and accurate with the exception
of the following corrections listed below:

PAGE / LINE / SHOULD HAVE BEEN

\_\_\_\_\_/_____/_____

\_\_\_\_\_/_____/_____

\_\_\_\_\_/_____/_____

\_\_\_\_\_/_____/_____

\_\_\_\_\_/_____/_____

\_\_\_\_\_/_____/_____

\_\_\_\_\_/_____/_____

\_\_\_\_\_/_____/_____

\_\_\_\_\_/_____/_____

\_\_\_\_\_/_____/_____

\_\_\_\_\_/_____/_____

\_\_\_\_\_/_____/_____

\_\_\_\_\_/_____/_____


_____      _____
Date                        DOUGLAS HALL

Sworn to and Subscribed before me, this _____ day
of _____, 20\_\_\_\_\_.


_____      _____
Notary Public              My commission expires