```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TENNESSEE
 2                          AT JACKSON

 3

 4   WILLIAM GRIFFIN and BILLIE    )
     BILLIE GRIFFIN,               )
 5                                 )
        Plaintiffs,                )
 6                                 )
     VS.                           )    No. 3:21-cv-00906
 7                                 )
     AMERICAN SELECT INSURANCE     )
 8   COMPANY d/b/a WESTFIELD,      )
                                   )
 9      Defendant.                 )
     _____X
10

11

12

13

14   _____

15

16                  DEPOSITION OF DAVID HERRING

17                 TAKEN ON NOVEMBER 28, 2022

18

19   _____

20

21

22
     Prepared by:
23   Carole K. Briggs, LCR #345
     Briggs & Associates
24   222 Second Avenue, North, Suite 340M
     Nashville, Tennessee  37201
25   Briggscourtreporting@hotmail.com
```

```
 1                          APPEARANCES:

 2

 3

 4    FOR THE PLAINTIFFS:

 5

 6    ALEXANDRIA FISHER, ESQUIRE
      Morgan & Morgan, P.A.
 7    810 Broadway
      Suite 105
 8    Nashville, Tennessee  37203
      afisher@forthepeople.com
 9

10
      FOR THE DEFENDANT:
11

12
      JAMES R. TOMKINS, ESQUIRE
13    Smith & Tomkins
      25 Century Blvd.
14    Suite 606
      Nashville, Tennessee  37214
15    jtomkins@smithtomkins.com

16

17

18

19

20

21

22

23

24

25
```

1                    TABLE OF CONTENTS

2

3    Witness                                              Page

4

5
     DAVID HERRING
6
     Examination by Mr. Tomkins                             5
7

8

9

10

11                   LIST OF EXHIBITS

12

13    Number     Description                               Page

14

15    Exhibit 1    Diagram                                 17

16    Exhibit 2    Estimate, 10/22/20                       46

17    Exhibit 3    Mr. Herring's expert disclosure          46

18    Exhibit 4    Estimate, 5/13                           47

19    Exhibit 5    Bryan Messick's scope notes              48
                   (Late-filed)
20

21

22

23

24

25

1              S T I P U L A T I O N

2

3

4          The deposition of David Herring, taken on

5     behalf of the defendants, remotely via Zoom, by

6     agreement of parties, on November 28, 2022, for all

7     purposes allowed under the Federal Rules of Civil

8     Procedure.

9          It is agreed that Carole K. Briggs, licensed

10    court reporter for the State of Tennessee, may swear the

11    witness, take his deposition, and afterwards reduce same

12    to typewritten form, and that the reading and signing of

13    the completed deposition by the witness is waived.

14          All formalities as to notice, caption,

15    certificate, et cetera, are expressly waived. All

16    objections, except as to the form of the question, are

17    reserved to the hearing.

18

19    (Unless previously provided, all names are spelled
      phonetically, to the best of the court reporter's
20    ability.)

21

22

23

24

25

1                 (Whereupon, the foregoing deposition

2                 began at 12:00 p.m.)

3    Whereupon,

4                         DAVID HERRING,

5    having been first duly sworn, was examined and deposed

6    as follows:

7    EXAMINATION BY MR. TOMKINS:

8         Q.    State your full name, please.

9         A.    David Herring.

10        Q.    And Mr. Herring, would you spell your last

11   name for the court reporter.

12        A.    H-e-r-r-i-n-g.

13        Q.    What is your address, please, sir?

14        A.    53 Sonata Street, S-o-n-a-t-a Street,

15   Freeport, Florida 32439.

16        Q.    Where are you from, Mr. Herring?  Where did

17   you grow up?

18        A.    I grew up in Louisiana.

19        Q.    What part?

20        A.    They called me yankee.  I was in -- I

21   originally grew up in Alexandria, Louisiana.  Central

22   Louisiana.

23        Q.    And how long have you been in Florida?

24        A.    About 12 years.

25        Q.    Did you move to Florida from Louisiana?

1        A.     I did.

2        Q.     Tell me about your -- well, we've got your

3   CV.  I am not going to go into all of your education,

4   and work experience, and all that sort of thing.  But

5   basically, you own and operate, is it WriteLoss?  Is

6   that the name of the company?

7        A.     Yeah, WriteLoss Claim Writing, yes.

8               MR. TOMKINS:  Madam Court Reporter, that's

9   W-r-i-t-e, WriteLoss.

10  BY MR. TOMKINS:

11       Q.     How long have you operated that business?

12       A.     Since 2013.

13       Q.     And tell the jury, if you would, please, sir,

14  just in simple terms, what does WriteLoss do?

15       A.     We write estimates for insurance claims.  We

16  write basically for the whole industry.  We write for

17  adjusters, attorneys, contractors.  We write estimates,

18  mainly in Xactimate.  We write about $60 billion a year

19  worth of line items.

20       Q.     And as I understand, as you say, you all

21  write estimates for homeowners, lawyers, and also for

22  other -- or for construction firms, you all will handle

23  the estimate writing part of their business, even if it

24  doesn't involve some kind of claim; is that right?

25       A.     That is true.  And we don't usually write

1   directly for the insured, though.  We usually work for a

2   contractor, adjuster, or an attorney.

3        Q.    And when you say an adjuster, you are talking

4   about a public adjuster; is that right?

5        A.    We often write for insurance adjusters as

6   well.

7        Q.    Tell me, typically, what insurance companies

8   or adjustment firms that handle cases for insurance

9   companies do you write for?

10        A.    Oh, Lord.  There's a lot of them.  And it

11   varies from time to time.  Usually, we write more for

12   insurance company adjusters whenever we have large

13   catastrophes like, say, Hurricane Ian or Hurricane

14   Michael.  And we'll pick up for a lot of the TPA firms,

15   Pilot, Colonial.  Just a lot of different firms, we'll

16   do some -- we'll work for them episodically.

17            And there are some people we just -- some

18   independent adjusters we've just worked for, for years.

19   That's probably about eight percent of our business.

20   The rest of our business is mainly the other things that

21   I told you about.

22        Q.    Tell me, other than this case, have you

23   worked with Morgan and Morgan before?

24        A.    I've submitted some estimates to USA Damage

25   that, I think, went to Morgan and Morgan.  But I haven't

1  been deposed or worked directly for Morgan on anything.

2       Q.    What about the Nation Law Firm?

3       A.    The Nation Law Firm is who I would have

4  submitted that work to.  So it would mainly be -- I

5  mean, I've done quite literally nothing but send

6  estimates, and a few affidavits, and whatnot to Nation

7  Law.

8       Q.    Can you give me some idea about how many

9  estimates you have prepared for someone at Nation Law?

10      A.    We probably, over time, probably produced

11 maybe 120, 130, somewhere in that area.  And that's a

12 guesstimate.  I don't know that for the exact number,

13 but that seems about right.

14      Q.    And as far as affidavits, any idea about how

15 many affidavits you might have submitted for them?

16      A.    I think six or eight.

17      Q.    And if I understand correctly, I think Nation

18 Law Firm has either merged with, been acquired by, some

19 manner affiliated with Morgan and Morgan.  Do you know

20 if they were at the time that you dealt with them?

21      A.    I don't know that.  I just don't know.

22      Q.    All right.  So how many different law firms

23 would you say you've probably written estimates for, say

24 in the last five years?

25      A.    A couple hundred.

1       Q.    And did they all represent property owners,

2   insureds?

3       A.    About 15 percent of that work is for defense,

4   and the rest of it is mainly plaintiff.

5       Q.    Can you give me the names of a couple of

6   defense firms that you have written estimates for in the

7   last five years?

8       A.    I cannot.  I could give that to you.  I could

9   ask my people to give me that.  I just don't have it

10  handy.

11      Q.    If you could just provide that to Ms. Fisher,

12  and she can pass it along to us.

13      A.    Sure.

14      Q.    Do you, by chance, know Jim Shoemaker there

15  in Florida?

16      A.    That name sure is familiar.  I'm not sure.

17      Q.    Do you know John Freud?

18      A.    Yes, I know John Freud.

19      Q.    How many depositions would you estimate

20  you've given in the last year?

21      A.    Eighty to ninety.

22      Q.    And how many of those were -- well, how many

23  times have you testified in court live in the last year?

24      A.    None.

25      Q.    And how many affidavits have you executed for

1    counsel in the last year?

2        A.    Probably 25 or 30.

3        Q.    Do you own any other businesses, besides

4    WriteLoss?

5        A.    My consulting company is called RiseDoc, Inc.

6    RiseDocument, Inc.

7        Q.    Can you spell that for the court reporter.

8        A.    R-i-s-e Document Inc.

9        Q.    And tell me, what does that business do?

10       A.    Mainly, what we do in that is, I do

11   appraisal, umpire work, and some expert work.  It does

12   appraisal and umpire work.

13       Q.    All right.  You said -- who did you say hired

14   you in this case?

15       A.    It would be USA Damage was originally who we

16   did the work for.

17       Q.    And who would your contact person at USA

18   Damage be?

19       A.    Chris -- is it Chris Knecht?  I can look it

20   up, if you would like.

21       Q.    Okay, and if you could spell that last name

22   for the court reporter.

23       A.    Just one second.  Let me see real quick.

24             MS. FISHER:  K-n-e-c-h-t.

25             THE WITNESS:  Yes.

1    BY MR. TOMKINS:

2         Q.    What is your understanding of what USA Damage

3    does?

4         A.    Mainly what they had us do was do assessments

5    on claims involving cast iron pipe damage.  They did

6    have us do some other wind-oriented things, but

7    primarily cast iron pipe.

8         Q.    And where is USA Damage located?

9         A.    They are located in south Florida.  I am not

10   sure exactly what city.

11        Q.    How many jobs did you do for USA Damage

12   involving cast iron pipes?

13        A.    Somewhere around 130 to 150.  I'm not sure of

14   the exact amount.

15        Q.    130 to 150 different jobs?

16        A.    We did them in several states.

17        Q.    Do you know how many, besides this one, you

18   did in Tennessee?

19        A.    I don't think we did any more than about 20

20   in Tennessee, maybe 25.  Not that many.

21        Q.    Were all of those jobs involving drafting an

22   estimate for getting access to a cast iron pipe plumbing

23   system and replacing those parts of the structure that

24   had to be removed or damaged to get access?

25        A.    Yes, sir.

1      Q.    Now, other than this case, have you ever

2   worked with DrainGo?

3      A.    No.

4      Q.    Now, I believe, if I understand the report

5   correctly, the actual physical inspection of the

6   Griffins' home was conducted by your employee, Joe

7   Segarra?

8      A.    That's correct.

9      Q.    And that was on May 5th, 2020?

10     A.    Yes, sir.

11     Q.    Were there any other inspections made of the

12   property on behalf of your company or USA Damage besides

13   that by Joe Segarra (phonetic)?

14     A.    No, other than the plumber coming, we didn't

15   return to the property.

16     Q.    And so there was the one inspection, other

17   than the inspection that the plumber made; is that

18   correct?

19     A.    Yes, sir.

20     Q.    What is Mr. Segarra's job title with your

21   company?

22     A.    He's a senior inspector.

23     Q.    Can you tell me a little bit about his

24   experience and qualifications?

25     A.    Mr. Segarra is a retired sergeant in the U.S.

1   Army.  He has been working for us for, I'd say, about

2   six-and-a-half years.  He assesses pretty much any kind

3   of loss that there is.  But I trained him years ago.

4   He's one of our top two guys in our business to do

5   estimates.

6             He'll run -- you know, his typical process is

7   he is going to run 3-D, a 3-D of the property to freeze

8   a moment in time, get the sketch right so the

9   measurements are correct.  He's going to take pictures.

10  He's going to generally make scope notes about what he

11  finds.  And then he produces those and sends them up to

12  our scoping group.

13      Q.    Other than his training and experience with

14  your company, do you know if Mr. Segarra has any other

15  training or experience in building estimates?

16      A.    His primary experience is with us.  He has --

17  I believe he has a IICRC water WTR accreditation.  I

18  think he also has a Haag Certified building envelope or

19  roof inspection.  But other than that, no.

20      Q.    He's not a licensed plumber or contractor; is

21  that correct?

22      A.    No, he is not.

23      Q.    Tell me, how did you determine the scope of

24  work for the estimate that was prepared in this case?

25      A.    Well, in the case that we -- when we worked

1   for this particular client, we would be aware of the --

2   we would be aware of the condition of a pipe problem.

3   So we would go in and initially assess the loss.  But

4   it's a little bit of a misnomer, because it breaks our

5   process just a little bit.  Because what we do is we go

6   in and scan that, take pictures.  And then we provide

7   that -- we produce the sketch, the floor plan.  And we

8   would send that back to USA Damage.

9          Then they would send that floor plan to the

10  plumber.  And then the plumber draws out where the pipes

11  are in the building so that we can see what is going to

12  be impacted in the structure at that point.  And then at

13  that point, we create the actual estimate.  Normally --

14  a normal process is we create the estimate when we're

15  there.  But we get the scope all together.  And we

16  create it and send it to the client.

17         But in this case, we sketch it, send it to

18  the client.  They send the plumber out to figure out

19  where the pipes have to be touched.  And then we do the

20  structural estimate.

21  Q.   So just to put it in simple terms, if it was

22  fire or wind, you would visualize where the damage was

23  and write your estimates based on your observations.  In

24  these kinds of cases, you get the diagram showing where

25  the plumbing system is situated.  And that's what you

1   use in lieu of just the visual inspection.  And then

2   write your estimate based on the location of the piping.

3   Is that a fair statement?

4        A.    Yes, sir.

5        Q.    I'm going to try to bring up a document.

6   Bear with me just a second.  All right.  Mr. Herring,

7   can you see the document that I put on the screen?

8        A.    Yes, sir.

9        Q.    I will suggest to you, that is a diagram

10  prepared by DrainGo showing the location of the cast

11  iron piping in the Griffin home and the location of

12  certain PVC piping.  Have you ever seen that diagram?

13       A.    Yes, sir.

14       Q.    Is that the diagram off of which you prepared

15  your scope of work?

16       A.    Yes.

17       Q.    Now, as I understand Mr. Rooker's testimony,

18  they would go back, the orange portion, which the PVC

19  pipe, basically, they would take that out along with the

20  vent pipe, and then replace that with PVC in the

21  existing location of the cast iron pipe.  Is that your

22  understanding of what plumbing work they would have

23  done?

24       A.    Yes.

25       Q.    And as I understand Mr. Rooker, that part of

1    the cast iron pipe that is running at pretty much kind

2    of a 45-degree angle there from the bathtub is all in

3    the crawl space of the home.  Is that your

4    understanding?

5         A.    I understand that it's -- he can access a

6    good bit of it through the crawl space, yes.

7         Q.    And then that portion that runs out toward

8    the septic tank, once it exits the footprint of the

9    house, goes under a concrete slab porch for some number

10   of feet, and then out to the septic tank.  Is that your

11   understanding?

12        A.    Yes.

13        Q.    And what part of the structure would have to

14   be torn out or removed to do that particular part of the

15   work?  Can you tell me?

16        A.    Well, as we understand it and as the plumber

17   has explained it to me, he's going to have to pierce

18   that brick wall, that exterior wall.  And that's going

19   to affect the exterior facade of the building.  There

20   was also some water damage to the wood floors that are

21   outside of this room.  And also, it's going to

22   necessitate removing some of the fixtures in the

23   bathroom to make the repair.

24        Q.    Tell me, the penetration in the outer wall,

25   that's on the rear elevation of the house, correct?

1          A.    It is.

2          Q.    And is there any reason that he couldn't use

3    the existing penetration through which the cast iron

4    piping now goes?

5          A.    You will have to ask the plumber that.  When

6    I spoke to him about this issue, because it was a

7    question on my mind, he told me that he was going to

8    affect the bricks and that he couldn't avoid it.  And so

9    in this case, I'm relying on others because that is the

10   only information I could have relied on in this case.

11         Q.    So you didn't make any determination yourself

12   as to whether or not there would have to be any

13   demolition of the existing structure to put the new

14   piping in, correct?

15         A.    No, it was after the conversation with the

16   plumber that I understood that that was going to be

17   necessary.

18               MR. TOMKINS:  Let's mark that diagram as

19   Exhibit 1 to the deposition, please, ma'am.

20               (Exhibit 1 was marked.)

21   BY MR. TOMKINS:

22         Q.    Now, your estimate, do you have a copy of

23   your estimate there in front of you?

24         A.    I do.

25         Q.    The first thing I'd ask you, your estimate

1    includes the $9952 estimate from DrainGo; is that right?

2        A.     That's correct.

3        Q.     And that would be, I think, the first line

4    item on your estimate, correct?

5        A.     I believe you're correct, yes.

6        Q.     Did you use Xactimate to prepare the estimate

7    in this case?

8        A.     Yes, sir.

9        Q.     Let me ask you, the next, Item 2 -- well,

10   actually 2 through 7 line items, you've got roof work.

11   What is that for?

12       A.     He's replacing the cast iron pipe, which

13   means that you are going to have to put a new boot in

14   for the pipe that runs to the roof.  And that's just

15   going to require some repair to the roof.

16       Q.     Can you tell me why it would involve

17   replacing 64 square feet of the metal roofing?

18       A.     Well, first of all, we wouldn't repair a, you

19   know, four-foot area of the metal roofing.  You would

20   use larger panels.  And so that's what you're seeing is

21   the larger panels.  So it was just the effort to remove

22   everything around that pipe jack, and then to put a new

23   one in, and then to put the new panels down.  That's it.

24       Q.     Let me ask you this:  If the plumber

25   indicated that he would just use the existing

1    penetration in the roof to remove the old vent pipe, and

2    put the new one in, and then put a new boot and flash

3    it, would you disagree with that approach, without

4    having to damage --

5         A.    Are you saying that the plumber is -- just to

6    clarify, the plumber is replacing the boot?

7         Q.    No.  What I'm asking you is, the plumber

8    indicated that he would just simply take the existing

9    vent pipe out, put the new pipe in through the

10   penetration that exists, and then somebody else would

11   have to put a new boot and flash it.  I guess my

12   question to you is, why would you have to take out any

13   part of the metal roofing to replace the vent pipe?

14        A.    Because the vent pipe is, if you're replacing

15   -- if you're replacing the vent pipe, you've got -- it

16   basically has flashing that runs underneath the roof.

17   So if you were to remove that to replace it, you would

18   have to -- it would have to impact the roof in some way.

19   Because otherwise --

20        Q.    You're going to basically take one panel off

21   and replace it, more or less?

22        A.    It depends on how it's structured.  But yeah,

23   it's going to be like be two panels.  I mean, it's not

24   much at all.

25        Q.    Now, the next, Line Items 8 through 10,

1    you're figuring to replace the entire concrete slab in

2    the back?

3         A.    Yes.

4         Q.    Now, the plumber says that he would cut a

5    trench in that, cut out the concrete, and then you could

6    patch it and refinish it.  Is there any reason you

7    couldn't do that, rather than replacing the entire slab?

8         A.    It depends on your definition of like kind

9    and quality, really.  I mean, I can, of course, cut a

10   slab.  And I can, of course, then fill that part of the

11   slab up.  But I no longer have a monolithic pour

12   anymore.  And I started with a monolithic pour, and I

13   don't have that anymore.  So it's going to be different.

14   If that is considered to be a reasonable repair, I just

15   wouldn't normally consider that to be a reasonable

16   repair because it's like kind and quality.

17        Q.    Let me ask you this:  If you did cut it and

18   didn't replace the entire slab, but just filled it and

19   refinished it, could you get a reasonable appearance

20   where it would be uniform and consistent across the

21   slab?

22        A.    I mean, are you basically suggesting that we

23   basically pour something over the entire slab on the top

24   and then --

25        Q.    Well, I am asking you that, what can you do

1   to make it uniform in appearance?

2        A.    Well, you would have to probably change the

3   height of it because you would have to add something on

4   top of it that would be a monolithic pour so you would

5   have the same appearance.  But at that point, you have a

6   patch underneath it, which is going to create an

7   expansion point.  So I'm just saying, it probably isn't

8   a -- it probably just isn't like kind and quality.

9        Q.    Well, as far as the expansion, you want that

10  with your concrete, anyway, don't you, so it doesn't

11  crack in other places?  I mean, all concrete has

12  expansion joints, doesn't it?

13       A.    That's true.  But what I'm saying is if you

14  put a trench in it and you just repour that, it's going

15  to expand it a different -- it's just not going to

16  expand the same way, partly because it's not the same

17  age.  It's just -- but I mean, you could dress it up,

18  yes.  You could dress it up if you put a -- you know, if

19  you resurfaced the whole top of the slab and make it

20  look pretty close to the same.  Is it the same product?

21  No.  But you could make it look close.

22       Q.    Let me ask you about Items 11 through 16.

23       A.    Yes, sir.

24       Q.    That is on the rear elevation.  You've got on

25  there to remove and replace 504 square feet of brick.

1   Can you tell me what area, what percentage of the rear

2   elevation that includes?  The surface area, what

3   percentage of the surface area?

4        A.    It's going to be all of the surface area on

5   the rear.

6        Q.    And you are saying that that's what you need

7   to do because of cutting a new exit hole to run your

8   line out?

9        A.    If we're going to remove brick, we're going

10  to end up having to affect the brick, yes.

11       Q.    And on Line Item 14, you've got remove and

12  replace 240 square feet of framing?

13       A.    Yes, sir.

14       Q.    Why would it involve replacing 240 feet of

15  framing?

16       A.    On this particular point, I would probably

17  believe that we need to reduce that.  Because it was

18  originally thought, when we were doing this, that there

19  was going to be more destruction on the back of the

20  kitchen.  And so I think that's where you were getting

21  that.  But I think that that could be reduced.

22       Q.    Reduced or stricken from the estimate?

23       A.    I think it would be greatly reduced, yes.

24       Q.    How much?

25       A.    Probably, it would be -- I mean, it's

1    probably reduced by about 80 percent.  It's pretty

2    substantial.

3        Q.    And Line 16, the general framing labor, would

4    that be reduced as well?

5        A.    Probably, that would be affected a little

6    bit.

7        Q.    Can you tell us how much?

8        A.    Probably about half.

9        Q.    And let's look at Line Items 17 through 20.

10   Is that removal and replacement of the brick veneer on

11   the entire surface of the left elevation?

12       A.    Yes, sir.

13       Q.    And why would you need to do that?

14       A.    Because it's continuous from the rear.

15       Q.    So basically, what you're including is -- and

16   let's save some steps on the other -- is replacing all

17   of the exterior brick on the house because of the need

18   to replace some of the brick on the rear elevation; is

19   that what you are telling us?

20       A.    Yes.

21       Q.    So your estimate includes rebricking the

22   entire home?

23       A.    Yes.

24       Q.    Let me ask you, on Line Item 27, it says:

25   Carpenter general framer per hour.  And underneath it

1    says:  D&R wood ramp.  Are you talking about demolishing

2    and removing a wooden ramp at the front of the home?

3        A.    No, we're talking about detaching and

4    resetting.

5        Q.    Is that like a -- what kind of ramp is that?

6        A.    It's a wood ramp.  I believe we've got a

7    picture of it.  I am not able to reference a picture of

8    it.  It's just a basic ramp.

9        Q.    Is it a ramp like somebody would use if they

10   had a wheelchair user or somebody with limited mobility?

11       A.    Yes.

12       Q.    And why would you take that off?

13       A.    Because if you're replacing the brick, you

14   would have to remove it to get access to the brick.

15       Q.    And Items 31 through 35, the right elevation,

16   again, you're including that based on the assumption

17   that you would replace all of the exterior -- all of the

18   brick on the exterior of the home to match; is that

19   right?

20       A.    Yes, for uniform appearance, yes.

21       Q.    Now, as far as wood flooring, if I remember

22   correctly, the testimony of the homeowner was that there

23   was some damage right outside the bathroom door.  Is

24   that your understanding, some water damage?

25       A.    Yes.

1      Q.    And your estimate includes replacing all of

2 the hardwood throughout the house; is that correct?

3      A.    Let me explain here.

4      Q.    If you will, can you give me a yes or no on

5 that, and then explain?

6      A.    At the present state of my estimate, no, it

7 doesn't say to replace the floor.  I believe it probably

8 needs to be replaced, but what we specified was the

9 entire floor to be sanded and refinished.

10     Q.    I'm sorry, yes, that's right, refinished.  So

11 are you saying today that it needs to be replaced rather

12 than refinished?

13     A.    I think if we were to do this under -- I

14 think it would be reasonable, okay, to replace the

15 entire roof -- I mean, replace the entire floor for the

16 simple reason that because it's water damaged and

17 because that water damage seeps into the wood, we're

18 probably still going to have to replace some small

19 percentage of that wood.  Because it's not going to

20 restore the same way.

21          So I don't know that we can get that same

22 wood in that same pattern with the same -- you know,

23 because it's a very -- if you look at the wood, it's a

24 pretty particular patterned wood.  So I just, I think it

25 would be -- I think we run the risk, if we just refinish

1   it, of having some problem right there at the bathroom,

2   at the entry of the bathroom.

3       Q.    You did not include in your estimate

4   replacing any of the hardwood, but rather you included

5   refinishing all of it?

6       A.    I did.  And I'm comfortable with that.  I'm

7   just saying that probably, if you were to push me on

8   this, if it was my home, I would replace the whole

9   thing.  Because I don't know that I can match it

10  perfectly because of the water damage.

11      Q.    But that's what you included in your

12  estimate, was to refinish?

13      A.    Yes, sir, that is correct.

14      Q.    And had you thought that was an inappropriate

15  repair, you would not have included that in your

16  estimate, would you?

17      A.    No, I wouldn't have -- if I didn't think it

18  was appropriate, I wouldn't have included it.  I'm just

19  making a note that, under a strict definition, I might

20  want to amend that, just like I would want to take out

21  some of the framing.  Because it was probably over, this

22  might be under scoped.  But you are correct, we did

23  specify to refinish.

24      Q.    Tell me, in the bathroom, I think you

25  included removing and replacing ceramic tile; is that

1   correct?

2       A.    Yes.

3       Q.    What wall or walls is that ceramic tile on?

4       A.    Ceramic is on the walls.  So I believe four

5   feet up.

6       Q.    All of the walls in the bathroom, other than

7   the door opening?

8       A.    Right.

9       Q.    And tell me, what necessitates replacing the

10  ceramic tile, in your opinion?

11      A.    You're going to -- because the plumber said

12  he was going to -- because the plumber said whenever he

13  had to redo this piping, it was going to affect that

14  exterior wall.

15      Q.    The exterior wall of the bathroom?

16      A.    Yes, sir.

17      Q.    You've got to remove and replace the light

18  fixture in the bathroom.  What would necessitate

19  replacing the light fixture?

20      A.    Is it remove and replace, or is it detach and

21  reset?

22      Q.    It shows remove and replace, as I understand

23  the estimate.

24      A.    It should probably be detach and reset.  What

25  line is that, if you don't mind?

1      Q.     Hold on just a second.  That is Page 5 or 6.

2  Let's see.  Line 48.

3      A.     That's a wall sconce.  Let's see.  They're

4  referring to this light over the mirror.  And I mean, it

5  would probably have to be detached and reset during this

6  process.  I don't think it needs to be replaced.

7      Q.     What about Line 49, on the bathroom mirror,

8  you've got remove and replace.  Should that be detached

9  and replaced?

10     A.     Generally speaking, they're going to put

11 those stupid mirrors in with a construction adhesive.

12 And nine times out of ten, they don't come out easy.

13     Q.     And then Line 50, you've got replacing the

14 window blind.  Could that not be taken down and put back

15 up?

16     A.     That probably needs to be detached and reset.

17 That's reasonable.

18     Q.     Then Line 55, you've got replacing a

19 ventilation fan.  Why would you replace the ventilation

20 fan?

21     A.     It must have been talking about this wall

22 heater.  Because I don't see a ventilation fan in this

23 room.

24     Q.     On Line 55, he refers to it as being a

25 ventilation fan, correct?

1      A.    Yeah, but that's wrong.  It's not a

2   ventilation fan.  In fact, just reviewing this, it's got

3   that if you're removing the tile, you're going to touch

4   this wall heater.  And I don't think you can replace the

5   wall heater.  I think it's probably outside of code.

6      Q.    Do you know that?

7      A.    I don't know that for sure.  That's --

8   honestly, that's a guess.  I just don't know that you

9   could put it back.

10      Q.    Let me ask you, you've got on your estimate

11   to remove and replace the sink, tub, and toilet.  Is

12   there any reason you can't just take those out and reset

13   them?

14      A.    You could probably detach and reset the

15   toilet.  And more than likely, you could do it with --

16   you could do the same with the vanity.  Yeah, I think

17   you could detach and reset them.  I think that that's

18   reasonable.

19      Q.    And the tub and shower door, any reason you

20   couldn't remove them and reset them?

21      A.    You would probably have to replace the shower

22   door just because of how it's set in the -- just because

23   how it looks like it's mortared into the tile.

24      Q.    What about the tub?

25      A.    I think you could leave the tub in place.  I

1    think you would do the door, but not the tub.

2         Q.    Tell me, have you ever had any direct

3    conversations with the Griffins?

4         A.    No, sir.

5         Q.    Do you know if Mr. Segarra did?

6         A.    I believe the Griffins were present when he

7    was there, yes.

8         Q.    Do you know if the Griffins ever advised Mr.

9    Segarra that they intended to remodel this bathroom

10   anyway?

11        A.    No.  We didn't have any -- I don't have any

12   knowledge of that.

13        Q.    Let me ask you, on Line 122, it shows -- and

14   that's under general conditions.  It shows R&R

15   sheathing, 128 square feet.  Where is that?

16        A.    We typically do that to set plywood

17   underneath the dumpster to avoid damage to the driveway.

18        Q.    Well, that says remove and replace sheathing?

19        A.    It's... I mean, they have to set it and

20   remove it.  It's a pretty -- I mean, you could do

21   material only, I guess, and just add some time to

22   actually put it there, and put it back, and pull it out.

23   But it's just CDX that you put underneath the feet of

24   the dumpster to avoid damage to the home.

25        Q.    And Line Item 124 says:  Mason bricks, slash,

1   stone per hour, $80 an hour.  And it looks like it's --

2   what is it, 65 hours?

3       A.    Yes, sir.

4       Q.    What is that for?

5       A.    That's for -- just, we note it when we do any

6   kind of brick work inside of Xactimate.  It usually is

7   -- it kind of minimizes the total time needed for

8   masonry.  And so we usually add a lit bit of time.

9   Because it's usually a slightly larger job than

10  Xactimate makes it out to be.

11      Q.    So let me make sure I understand, so the jury

12  will understand.  Xactimate bases its estimate numbers,

13  obviously, on unit pricing that you insert, and also the

14  scope of the work, as far as the dimensions, and that

15  sort of thing.  And it includes both labor and material.

16  But it's your belief that the labor amount that

17  Xactimate uses by default is not enough, and you've

18  added on an additional 80 hours on top of that?

19      A.    Yes, sir.  Xactimate does -- Xactimate is

20  basically -- how they state it is that it's a general

21  guide and that the estimators are responsible for

22  particular market conditions.  But Xactimate, in

23  general, has a few areas where it has some serious

24  problems.  And one of those is on masonry.  And the

25  other is paint.  They just usually seem to undershoot

1    the cost of what those two services are.

2         Q.    You've added on an extra $6,240 for masonry

3    work?

4         A.    Yes, sir.

5         Q.    And that's based on an additional 80 hours

6    over and above what the Xactimate estimate calls for,

7    correct?

8         A.    Yes.

9         Q.    Did you determine the 80-hour total?

10              MS. FISHER:  Are you saying $80 an hour or 80

11    hours?

12              MR. TOMKINS:  Additional 80 hours.

13    Additional 80 hours, how did he come up with an

14    additional 80 hours.

15              THE WITNESS:  We put a certain amount of time

16    for all of the windows because all of the work around

17    the windows is not usually included in Xactimate.  We

18    also added, per elevation, I think we added another 11

19    hours each for each elevation.

20              MR. TOMKINS:  Can we take a five-minute

21    break?

22              (Recess observed.)

23    BY MR. TOMKINS:

24         Q.    Mr. Herring, let me ask you to look at Line

25    Item 125.

1      A.    Yes, sir.

2      Q.    That is supervision, management supervision,

3   for the job; is that right?

4      A.    That is particularly -- if you look at Line

5   112, you will see supervision, which is actually

6   supervision.  And then Line 125, it says safety

7   underneath it.  That is just basically an OSHA

8   requirement that any time you're using anything

9   mechanized, whether it be a saw, whether it be a

10  skid-steer, whatever, whether you're dropping a

11  dumpster, whatever it is, you're supposed to have a

12  safety supervisor on the ground that is with it at all

13  times.

14     Q.    Would it be typical for any general

15  contractor that would handle a job of this magnitude

16  that they would have a safety officer on staff and use

17  them, and that would be part of the overhead of the

18  business?

19     A.    Overhead typically doesn't involve site

20  specific things.  So I wouldn't say that it was normally

21  a part of overhead.

22     Q.    Would a general contractor that you would

23  typically hire for this kind of job charge extra for

24  that safety officer?

25     A.    If he lived within 100 miles of someone who

1    enforced OSHA regs, yes.  Just being completely honest

2    there.  He wouldn't if there was no OSHA.

3        Q.    You've got, on Line 28, 20 hours for an

4    electrician.  What would be the work involved with an

5    electrician?

6        A.    Well, we were going to be touching the

7    exterior walls and we had electrical that was going to

8    be affected in the bathroom.  And I think that there was

9    going to be some electrical in the exterior wall.  That

10   20 hours -- let's see.  It normally costs us about $1200

11   to get an electrician to come out.  And so we just

12   figured that that's going to be part of the mix.

13            It's possible that they wouldn't have to use

14   that much electrical.  It is possible, depending on how

15   much they were taking off the back wall.

16       Q.    Let me ask you, Line Item 130, you've got a

17   labor minimum for water extraction and remediation?

18       A.    Yes.

19       Q.    What is that for?  What water extraction

20   would be involved in this job?

21       A.    Well, the fact that it's a minimum means that

22   there was a really, really tiny amount of it.  And so

23   it's just putting the -- let's see here.  It's that in

24   the bathroom, and they used some antimicrobial.  That's

25   the only place that we used anything like that.  And it

1    was such a minimal amount that it would up -- it kicked

2    on the minimum in Xactimate for that.

3        Q.    Let me ask you to look at Page 13 of your

4    estimate.

5        A.    Yes, sir.

6        Q.    You've got a total for other structures,

7    $264.48 before overhead and profit.  What is that for?

8        A.    Let me see if something would have grabbed

9    that delineation.  Probably detaching and resetting that

10   ramp.  It would have been just picked up as other

11   structures.  I don't know that it technically meets that

12   definition, but I think that's where it would be.

13       Q.    All right.  Tell me, how much have you been

14   paid or how much has your company been paid to date on

15   this case?

16       A.    I believe we've been paid $550.

17       Q.    And how many estimates have you written in

18   this case?

19       A.    I am going to define what I'm saying here so

20   it's not confused.  There are a lot of edits that

21   happened during the process.  But basically -- just one

22   second here and I will tell you.  You just would not

23   believe how regular the name Griffin is in my world.  So

24   many Griffins.

25             So basically, we had a sketch that was

1    created on May the 6th.  That was after Mr. Segarra went

2    to the site.  We sent that sketch to USA Damage.  They

3    got that to the plumber.  After the plumber got back to

4    us, we then wrote a scope of the damages.  Had the

5    plumber's estimate at that point.  And we wrote one

6    estimate on October 21st.

7            Then we got word that this was -- let's see.

8    In October -- no, in May of this year, we got word that

9    this was going to be a subject of litigation.  And so we

10   returned to the estimate.  We created several updates,

11   as we were discussing it.  And then so basically, the

12   estimate was ultimately edited about six times until it

13   got to the form that you presently see it.

14      Q.    Now, let me show you -- can you see the

15   document I just put up on the screen?

16      A.    I can.

17      Q.    Hold on.  That's not the one I wanted to put

18   up there.  Bear with me.

19      A.    Take your time.

20      Q.    I think I have the right one up now.  I've

21   got a letter and estimate from USA Damage Response Team

22   dated October 22, 2020.  It says it's directed to the

23   Nation Law Firm.  Is that an estimate that you prepared?

24      A.    Yes.

25      Q.    And I believe the amount of that estimate was

1    34 -- well, let's see.  I will look before any

2    application of depreciation here.  It looks like it was

3    $37,014.13; is that right?

4          A.     That is correct.

5          Q.     What did you use to develop your scope of

6    work on that estimate?

7          A.     We used the scope notes that were originally

8    provided, that Bryan Messick in my office put together

9    from Mr. Segarra's estimate -- I mean, site visit, after

10   we got the plumbing report in.

11         Q.     So this is based on the report from the

12   plumber, as we discussed earlier, as to the scope of

13   what they proposed to do, and then the site inspection

14   by Mr. Segarra?

15         A.     Let me delineate just one thing you are

16   saying here.  When you say the scope provided by the

17   plumber, it is quite literally the schematic or the edit

18   to the schematic that was provided by the plumber.  It

19   wasn't, per se, a scope.  That's why there are sometimes

20   some edits that happen to it subsequent to that because

21   there are some things that need to be cleared up.

22         Q.     Let me ask you this, so I'm clear:  Other

23   than oral communication with DrainGo or a representative

24   of DrainGo, did you get any other information from them,

25   other than the diagram that we were looking at earlier?

1      A.    At that point, that's all we had gotten.

2      Q.    So you had not gotten anything else, either

3  digital or in writing?

4      A.    No.

5      Q.    And at that time, what, as I understand, they

6  proposed to replace the cast iron plumbing, as per that

7  diagram that we looked at; is that a fair statement?

8      A.    Yes.

9      Q.    And based on that, you wrote this estimate

10  for $37,000, correct?

11      A.    Based on our understanding at the time, that

12  is correct.

13      Q.    Then you wrote another estimate, which I

14  believe -- well, you said you had about six.  What was

15  the amount of the next estimate that you wrote?

16      A.    There's a couple of different ones at 102.

17  And I think there was one in here that added some COVID

18  oriented protocols that were ultimately removed.  And

19  that was why one of the edits took place.

20      Q.    If you could, give me the amounts of each

21  estimate that you wrote, the date and the amount.

22      A.    On August 21st, 2020, $34,344.61.

23      Q.    I am sorry, 34?

24      A.    $34,344.61.

25      Q.    All right.

1      A.      On October the -- I'm sorry.  On May the 13th

2   of this year, the grand total was 102,681.76.  And then

3   on the same day, actually -- this may not have been

4   actually sent to the client, actually.  So I'm talking

5   about some internal things.  We created an estimate that

6   included the COVID protocols, 132,046.17.  And then we

7   went back, basically, to the former estimate in our

8   final version, which was 102,681.76.  And that happened

9   May the 16th of this year.

10             So we internally dealt with this in between

11  May 13th and May 16th of this year and ended up in the

12  amount that we were discussing today, for the majority

13  of our time.

14      Q.      So we had basically four estimate totals.

15  And the final number at 102,681.76?

16      A.      Yes, sir.

17      Q.      Tell me, if you would, please, sir, what

18  information did you get that caused your total to go

19  from 34,344.61 to 102,681.76?

20      A.      Well, there's a couple of things.  As I

21  mentioned to you earlier in our conversation, that I had

22  become aware that this was going to -- that I was going

23  to be deposed on this, so I needed to look at it more

24  thoroughly.  And I noted, number one, that we needed to

25  deal with the flooring, which we hadn't dealt with at

1    that point.  And that, ultimately, I discussed with the

2    plumber the fact that he was going to damage the rear

3    wall and that was going to affect the bricks.

4            That's where most of the major changes came

5    from.  Of course, also, we removed the COVID protocols

6    because those weren't really necessary at this juncture.

7    Incidentally, what we didn't do to this, which we would

8    have normally done before we did this, was we didn't

9    update the price list to a current price list.  Which I

10   think would have been reasonable and appropriate to do

11   as well.

12       Q.    So the $34,000, you're telling me, did not

13   include the flooring refinished throughout the house,

14   the hardwood flooring?

15       A.    I do not believe that it did.  I can confirm

16   that, but I do not believe that it did.  Hold on one

17   second here.  It did not.

18       Q.    If I'm looking at that estimate correctly, it

19   included some hardwood floor repair in the hall and the

20   living room; is that correct, outside the bathroom?  No,

21   I take that back.  Let me direct your attention.  I

22   think the living room starts at Line Item 63.

23       A.    Right.

24       Q.    So in simple terms, the original estimate

25   included the repair -- the plumbing replacement, the

1   roof work related to the plumbing replacement, and the

2   repair work, remediation work, in the bathroom.  Is that

3   a fair statement?

4        A.    It included the roof.  It included the roof,

5   the plumbing, and damages to the bathroom.  And some

6   COVID protocols, was the main things.

7        Q.    And so if I understand what you're saying

8   today, the COVID protocols would no longer be

9   applicable; is that right?

10       A.    I don't believe they would be applicable.

11       Q.    Tell me, on your estimate there dated October

12  22, 2020, why did you not include the flooring repairs

13  outside the bathroom?

14       A.    Because I hadn't looked at this estimate yet.

15  And I hadn't just given it a critical eye.  And I just

16  -- I noted the damage.  And I noted that it was going to

17  -- that I was going to be sitting in this chair and I

18  didn't want to not deal with it because it was an

19  obvious thing that should have been added.

20       Q.    Well, surely you looked at this, and reviewed

21  it, and critiqued it before mailing it to the Nation Law

22  Firm on October 22, 2020, did you not?

23       A.    I did not look at this initially.  As a

24  matter of fact -- let's see.  Hold on a second.  I

25  didn't send this to Nation.  Let me just see here.  Hold

1    on.

2            Actually, they sent this particular file to

3    -- the particular file you're discussing with me, they

4    sent it to the client on October 21st, 2020.  And we

5    didn't begin to touch it again until October 10th, 2021.

6        Q.    All right --

7        A.    So my point is that they sent this out.  And

8    I mean, it was before we -- they sent that out, but I

9    really hadn't touched it at that point.  I'm just

10   speaking specifically about me.  The estimation staff

11   had looked at it.  And I think they just made some

12   errors.  I mean, the main thing that made me go back

13   into it was the COVID stuff.  I needed to make sure that

14   was removed.

15       Q.    Who was the estimation staff that reviewed

16   this before you sent it to USA Damage Response Team?

17       A.    It was -- the gentleman that wrote the

18   estimate was Dejan, D-e-j-a-n.  His last name is very

19   hard to spell.  It's M-l-a-d-e-n-o-v-i-c.  I will give

20   you $5 if you can say it.  He wrote that estimate

21   originally off of a scope that was provided by Bryan

22   Messick in my office.  That's B-r-y-a-n.  Messick is

23   M-e-s-s-i-c-k.

24       Q.    Was that after Mr. Segarra had inspected the

25   premises?

1       A.      That was after we received the sketch from

2    the plumber.

3       Q.      And was it after Mr. Segarra personally went

4    to the premises, which I believe was in August of 2020?

5       A.      Yes, it was in October that we got that back

6    from the plumber.

7       Q.      So at the time that this original estimate,

8    of some $34,000 was written, you had gotten information

9    from the plumber and Mr. Segarra had personally

10   inspected the loss location; is that correct?

11      A.      That's right.

12      Q.      Why was the replacement of all of the brick

13   on the exterior of the home not included in the original

14   estimate?

15      A.      As I told you a little while ago, because I

16   had not personally spoken to the plumber, and I wasn't

17   aware that it was going to affect the rear elevation of

18   the property, until I did.

19      Q.      So when did you speak to the plumber after

20   that first estimate?

21      A.      My staff spoke to the plumber -- I'm not sure

22   what date, but it was after this -- it was when I asked

23   a series of questions to staff, and I know that the

24   plumber was contacted at that point.  And then I spoke

25   to the plumber to confirm those things before we went to

1    deposition.

2         Q.    And what was that series of questions that

3    you posed to your staff?

4         A.    My questions to the staff was, is there some

5    reason why we have not touched the floor that was

6    damaged?  And if we're running pipe out the back of the

7    building, if we're touching that concrete slab, if it's

8    typical of most cast iron things that we do, are we

9    going to be affecting the brick?  Which they said yes,

10   we were.

11              And then I confirmed with the plumber again,

12   before we went to deposition.  Because I wanted to -- I

13   knew that was going to be a point of some contention.

14   And I wanted to make sure it was confirmed.

15        Q.    So let me make sure I understand.  From

16   August of 2020 until May of 2022, there were no

17   modifications to your estimate; is that right?

18        A.    Right.  We didn't -- it wasn't really -- once

19   it was sent to the client, unless they had an issue with

20   it, we wouldn't have done anything to it at that point.

21        Q.    And you're saying that the first estimate

22   went out to USA Damage Response Team, who had hired you,

23   without your review; is that correct?

24        A.    I did not personally review it.  That is

25   correct.

1     Q.    Whose job would it have been to have reviewed

2    that before it went out to make sure that it was

3    accurate and correct?

4     A.    Dejan or Michael Halkos (phonetic), either

5    one of them, would have been authorized to send

6    something to a client because they would have been the

7    ones responsible for checking it.

8     Q.    Are they still with you?

9     A.    They are.

10     Q.    And during that two, almost two-year

11    interval, nobody raised any question about the brick or

12    the flooring?

13     A.    No.

14     Q.    You raised that in your own mind when you

15    went back and looked at the estimate to prepare for a

16    deposition in the case; is that correct?

17     A.    I reviewed it because I wanted to -- I don't

18    like to be in deposition and not have a good

19    understanding of the scope and any edits I would have

20    made otherwise, I would have done at that point.

21     Q.    Let me ask you, the estimate for 132.046.17,

22    without going into every line item, is the central

23    difference in that and the 102 estimate the removal of

24    the COVID protocols?

25     A.    Yes, sir.

1        Q.     Any other substantive changes?

2        A.     There was a few other minor things, but

3    nothing major.

4        Q.     Do you recall what those were?

5        A.     I don't.

6               MR. TOMKINS:  Let's make some exhibits here

7    real quick.  The October 22, '20 estimate that's on the

8    screen, Ms. Court Reporter, what exhibit number would

9    that be, 3 or any?

10              MS. FISHER:  I have Exhibit 1 to the

11   deposition the diagram of the plumbing report.  So it

12   might be Exhibit 2.  I might have missed one.

13              MR. TOMKINS:  Carole, do you show any others?

14   I don't think there are any others either.  Let's go

15   ahead and do this, and if we miss one, we can clean it

16   up.  This October 22, 2020 estimate, let's make that 2.

17              (Exhibit 2 was marked.)

18              MR. TOMKINS:  And let's make his disclosure

19   3.

20              MS. FISHER:  Just like the full expert

21   disclosure, everything related to him?

22              MR. TOMKINS:  Yeah, his full expert

23   disclosure, we'll make 3.

24              MS. FISHER:  Okay.

25              (Exhibit 3 was marked.)

1            MR. TOMKINS:  And let's see.  Bear with me.

2    I was thinking there was one other one.  And let's do

3    this, I've got to find it, but I'll e-mail it to

4    everybody.  The 5/13 estimate in the amount of

5    132,046.17, we'll make that -- what would that be, 4?

6            MS. FISHER:  Yes.

7            (Exhibit 4 was marked.)

8    BY MR. TOMKINS:

9        Q.    All right.  Mr. Herring, did you bring any

10   documents today that were requested in our most recent

11   notice of deposition?

12       A.    I sent every document that I have to Ms.

13   Fisher.  Is that correct?

14       Q.    I don't know.

15            MS. FISHER:  I think so.  Jim, we've -- those

16   three estimates you just listed, the one from October of

17   2020, the 132K, and the 102K are the only three

18   estimates I have.  And then invoices from USA DRT, which

19   list the line item for them, have been sent to you in

20   discovery.  I don't have any other invoices.

21   BY MR. TOMKINS:

22       Q.    Let me ask you, Mr. Herring, are there any

23   e-mails or other communications between your firm and

24   the plumbing company?

25       A.    No, there's no e-mails between us and the

1  plumbing company.  The only communication we have was

2  when they sent -- when USA Damage sent that back to our

3  system as an edit to include the plumbing information.

4      Q.   Do you have any handwritten notes in your

5  file regarding this job?

6      A.   No, I do not.

7      Q.   Do you have any computer notes?

8      A.   I have the original scope notes that Bryan

9  Messick, in our office, made.  And outside of that, no.

10      Q.   Do you have any notes --

11           MR. TOMKINS:  Well, let me ask.  I would ask

12  for a copy of those as a late-filed 5.

13           (Exhibit 5 was marked late-filed.)

14  BY MR. TOMKINS:

15      Q.   Do you have any notes in your file relative

16  to your decision to go back and add the flooring and the

17  brick?

18      A.   No, I just called one of our estimators and

19  said that, you know, we need to go back and look at

20  these things and made specific adds.  Just be a voice.

21  I also touched the file at some point and made some

22  edits to it myself.

23      Q.   But what I am asking about, do you have any

24  notes that you made --

25      A.   No, sir.

1       Q.     -- about your decision to go back and add

2   those things?

3       A.     No, sir, it was literally a phone call I

4   made.  That's all.

5       Q.     Now, you don't do -- I mean, your company

6   doesn't do this type of work; is that right?  It just

7   simply estimates the cost of the work?

8       A.     Do we do construction; is that what you're

9   asking?

10      Q.     Yeah, you all don't do any construction or

11  remediation work yourselves; is that right?

12      A.     No, we estimate the repair to real property.

13      Q.     Any contractors with whom you all have

14  reviewed your numbers to secure an agreed price to do

15  this work?

16      A.     We have not talked to any contractors.

17      Q.     Now, let me ask you this:  What is your

18  understanding about where the penetration is in the

19  exterior wall, the back wall, of the Griffins' home,

20  where the drain line goes through?  Is it your

21  understanding that that is above or below grade?

22      A.     I believe it's technically, if you want to

23  get down to it, it's basically at grade.  It's -- what

24  the plumber told me specifically was it was going to

25  impact the bricks right at the bottom of the bricks and

1  there was nothing they could do about it.  So I assume

2  it's got to be right at grade.

3      Q.    Is it your understanding that it would be

4  exposed or it would be hidden based on --

5      A.    He did not say it was exposed.  He said it

6  was going to affect the bricks.  I did not ask him for

7  specificity on, you know, where the pipe was.  I

8  assumed, because it's pretty common, that because of

9  what he -- because of his work, he was just going to

10 have to do that, and there was nothing he could do about

11 it.

12     Q.    And which plumber told you that?

13     A.    The plumber with Drain Right or Drain Co. --

14 hold on, I'll tell you.  That would be Jimmy Rooker.

15     Q.    And you would agree with me that if that

16 penetration didn't affect the visible brick or if they

17 could use the existing penetration and not have to make

18 a new hole, that none of that exterior brick work would

19 have to be done, correct, that you included in your

20 estimate?

21     A.    I would agree with you, if the plumber said

22 the bricks have to go, they have to go.  It's not my

23 opinion.  It was just what I was explained.  I mean,

24 that's why I did.  So I mean, I can't really opine on

25 it, other than saying that Mr. Rooker said that that was

1   necessary.  Incidently, I checked with him twice on that
2   because I wanted to be sure that that was the case.
3        Q.    When did you check with him twice on that?
4        A.    I spoke to him yesterday, actually, to ask
5   the question again because I thought it would be a good
6   idea to just hear that one more time.
7        Q.    And what did he tell you yesterday?
8        A.    He said, yes, I'm going to have to impact the
9   bricks.  I can't avoid it.  I said, you're telling me
10  you can't avoid it?  He said, yes, I can't avoid it.
11  That's what he told me.
12       Q.    And he told you it would be the brick that is
13  exposed?
14       A.    He said specifically -- I am not parsing
15  words with you, I am just telling you specifically,
16  okay?  He said, the bricks are going to be impacted.
17  Yes, I can't avoid it.  He didn't say the bricks that
18  are exposed.  He didn't say it was going to be halfway
19  up the wall.  He said, the bricks are going to be
20  damaged because of what I have to do.
21       Q.    And you did not ask him if he was talking
22  about the brick below grade only, did you?
23       A.    I had no reason to ask him that, no.  I mean,
24  I assumed if there was some specificity, he would have
25  told me.

1      Q.     And when was the other time that you asked
2   him specifically about that?
3      A.     We spoke to them, I believe, in October.
4      Q.     Of what year?
5      A.     2021.
6      Q.     What brought it up in October of 2021?
7      A.     As I stated before, I said that whenever I
8   was -- knew that this was going to be going to
9   deposition and possibly to trial, I needed to make sure
10  that I could understand everything about the loss that I
11  could understand.  And so that's when it came up.
12     Q.     And I am not trying to badger you or
13  anything.  But I thought you said that was in May of
14  this year when you wrote the larger estimate for
15  102,681?
16     A.     It was in October of 2021.
17     Q.     And did you write a new estimate in October
18  of 2021?
19     A.     The estimate -- yeah, we wrote the larger
20  estimate in... Let's see.  I'm sorry.  I told you wrong.
21  I was looking at a note that was higher up in this thing
22  that I'm looking at.  I'm sorry.  Just amend that.  We
23  would have talked to him sometime around May 13th.
24     Q.     So you would not have talked to him in
25  October?

1        A.      Would not have talked to him in October.

2     That is incorrect.  My action came in on this probably

3     in between May 13th and May 16th of this year.

4                MR. TOMKINS:  Let's take a five-minute break.

5     Let me review this.  I think I'm done, but let's take a

6     quick break.  I'll make sure.

7                THE WITNESS:  Sure.

8                MS. FISHER:  Sounds good.  Thank you.

9                (Recess observed.)

10               MR. TOMKINS:  Those are all of the questions

11    I have.

12               MS. FISHER:  Thank you.  So let me just be

13    clear.  The late-filed things you want from Mr. Herring

14    are a list of the defense firms he's done work for -- or

15    that's not a -- you didn't mark that an exhibit.  That's

16    just something you want as a follow-up.

17               MR. TOMKINS:  Yeah, I think the only

18    late-filed, I think, are the Messick notes.

19               MS. FISHER:  Okay.  David, can you just send

20    both of those to me?

21               THE WITNESS:  I will do that.  Thank you

22    both.  Thank you, Mr. Tomkins.

23               MR. TOMKINS:  Thank you.

24               FURTHER DEPONENT SAITH NOT.

25

1                          CERTIFICATE

2

    STATE OF TENNESSEE        )
3                             )    SS.
    COUNTY OF DAVIDSON         )
4

5              I, CAROLE K. BRIGGS, Licensed Court Reporter

6    within and for the State of Tennessee, do hereby certify

7    that the above deposition was reported by me and that

8    the foregoing pages of the transcript is a true and

9    accurate record to the best of my knowledge, skills, and

10   ability.

11             I further certify that I am not a relative,

12   counsel or attorney of either party nor employed by any

13   of the parties in this case or otherwise interested in

14   the event of this action.

15             IN WITNESS WHEREOF, I have hereunto affixed my

16   official hand on this 13th day of December 2022.

17

18

19

20

21

22   _____

23   CAROLE K. BRIGGS

24   Shorthand Reporter

25   Tennessee License No. 345

**Exhibits**

**Exhibit 1** 3:15 17:19,20 46:10

**Exhibit 2** 3:16 46:12,17

**Exhibit 3** 3:17 46:25

**Exhibit 4** 3:18 47:7

**$**

**$1200** 34:10

**$264.48** 35:7

**$34,000** 40:12 43:8

**$34,344.61** 38:22,24

**$37,000** 38:10

**$37,014.13** 37:3

**$5** 42:20

**$550** 35:16

**$6,240** 32:2

**$60** 6:18

**$80** 31:1 32:10

**$9952** 18:1

**1**

**1** 17:19,20 46:10

**10** 19:25

**100** 33:25

**102** 38:16 45:23

**102,681** 52:15

**102,681.76** 39:2,8,15,19

**102K** 47:17

**10th** 42:5

**11** 21:22 32:18

**112** 33:5

**12** 5:24

**120** 8:11

**122** 30:13

**124** 30:25

**125** 32:25 33:6

**128** 30:15

**12:00** 5:2

**13** 35:3

**130** 8:11 11:13,15 34:16

**132,046.17** 39:6 47:5

**132,046.17** 45:21

**132K** 47:17

**13th** 39:1,11 52:23 53:3

**14** 22:11

**15** 9:3

**150** 11:13,15

**16** 21:22 23:3

**16th** 39:9,11 53:3

**17** 23:9

**2**

**2** 18:9,10 46:12,16,17

**20** 11:19 23:9 34:3,10 46:7

**2013** 6:12

**2020** 12:9 36:22 38:22 41:12,22
42:4 43:4 44:16 46:16 47:17

**2021** 42:5 52:5,6,16,18

**2022** 44:16

**21st** 36:6 38:22 42:4

**22** 36:22 41:12,22 46:7,16

**240** 22:12,14

**25** 10:2 11:20

**27** 23:24

**28** 34:3

**3**

**3** 46:9,19,23,25

**3-D** 13:7

**30** 10:2

**31** 24:15

**32439** 5:15

**34** 37:1 38:23

**34,344.61** 39:19

**35** 24:15

**4**

**4** 47:5,7

**45-degree** 16:2

**48** 28:2

**49** 28:7

**5**

**5** 28:1 48:12,13

**5/13** 47:4

**50** 28:13

**504** 21:25

**53** 5:14

**55** 28:18,24

**5th** 12:9

**6**

**6** 28:1

**63** 40:22

**64** 18:17

**65** 31:2

**6th** 36:1

**7**

**7** 18:10

**8**

**8** 19:25

**80** 23:1 31:18 32:5,10,12,13,14

**80-hour** 32:9

**A**

**access** 11:22,24 16:5 24:14

accreditation 13:17

accurate 45:3

acquired 8:18

action 53:2

actual 12:5 14:13

add 21:3 30:21 31:8 48:16 49:1

added 31:18 32:2,18 38:17 41:19

additional 31:18 32:5,12,13,14

address 5:13

adds 48:20

adhesive 28:11

adjuster 7:2,3,4

adjusters 6:17 7:5,12,18

adjustment 7:8

advised 30:8

affect 16:19 17:8 22:10 27:13 40:3 43:17 50:6,16

affected 23:5 34:8

affecting 44:9

affidavits 8:6,14,15 9:25

affiliated 8:19

age 21:17

agree 50:15,21

agreed 49:14

ahead 46:15

Alexandria 5:21

amend 26:20 52:22

amount 11:14 31:16 32:15 34:22 35:1 36:25 38:15,21 39:12 47:4

amounts 38:20

angle 16:2

antimicrobial 34:24

anymore 20:12,13

appearance 20:19 21:1,5 24:20

applicable 41:9,10

application 37:2

appraisal 10:11,12

approach 19:3

area 8:11 18:19 22:1,2,3,4

areas 31:23

Army 13:1

assess 14:3

assesses 13:2

assessments 11:4

assume 50:1

assumed 50:8 51:24

assumption 24:16

attention 40:21

attorney 7:2

attorneys 6:17

August 38:22 43:4 44:16

authorized 45:5

avoid 17:8 30:17,24 51:9,10,17

aware 14:1,2 39:22 43:17

B

B-R-Y-A-N 42:22

back 14:8 15:18 20:2 22:19 28:14 29:9 30:22 34:15 36:3 39:7 40:21 42:12 43:5 44:6 45:15 48:2,16,19 49:1,19

badger 52:12

based 14:23 15:2 24:16 32:5 37:11 38:9,11 50:4

bases 31:12

basic 24:8

basically 6:5,16 15:19 19:16,20 20:22,23 23:15 31:20 33:7 35:21, 25 36:11 39:7,14 49:23

bathroom 16:23 24:23 26:1,2,24 27:6,15,18 28:7 30:9 34:8,24 40:20 41:2,5,13

bathtub 16:2

Bear 15:6 36:18 47:1

began 5:2

begin 42:5

behalf 12:12

belief 31:16

billion 6:18

bit 12:23 14:4,5 16:6 23:6 31:8

blind 28:14

boot 18:13 19:2,6,11

bottom 49:25

break 32:21 53:4,6

breaks 14:4

brick 16:18 21:25 22:9,10 23:10, 17,18 24:13,14,18 31:6 43:12 44:9 45:11 48:17 50:16,18 51:12, 22

bricks 17:8 30:25 40:3 49:25 50:6,22 51:9,16,17,19

bring 15:5 47:9

brought 52:6

Bryan 37:8 42:21 48:8

building 13:15,18 14:11 16:19 44:7

business 6:11,23 7:19,20 10:9 13:4 33:18

businesses 10:3

C

call 49:3

called 5:20 10:5 48:18

calls 32:6

Carole 46:13

Carpenter 23:25

case 7:22 10:14 12:1 13:24,25 14:17 17:9,10 18:7 35:15,18 45:16 51:2

cases 7:8 14:24

cast 11:5,7,12,22 15:10,21 16:1 17:3 18:12 38:6 44:8

catastrophes 7:13

caused 39:18

CDX 30:23

central 5:21 45:22

WILLIAM GRIFFIN and BILLIE BILLIE GRIFFIN vs AMERICAN SELECT INSURANCE
HERRING, DAVID on 11/28/2022
Index: ceramic..detached

ceramic 26:25 27:3,4,10

Certified 13:18

chair 41:17

chance 9:14

change 21:2

charge 33:23

check 51:3

checked 51:1

checking 45:7

Chris 10:19

city 11:10

claim 6:7,24

claims 6:15 11:5

clarify 19:6

clean 46:15

clear 37:22 53:13

cleared 37:21

client 14:1,16,18 39:4 42:4 44:19 45:6

close 21:20,21

code 29:5

Colonial 7:15

comfortable 26:6

common 50:8

communication 37:23 48:1

communications 47:23

companies 7:7,9

company 6:6 7:12 10:5 12:12,21 13:14 35:14 47:24 48:1 49:5

completely 34:1

computer 48:7

concrete 16:9 20:1,5 21:10,11 44:7

condition 14:2

conditions 30:14 31:22

conducted 12:6

confirm 40:15 43:25

confirmed 44:11,14

confused 35:20

considered 20:14

consistent 20:20

construction 6:22 28:11 49:8,10

consulting 10:5

contact 10:17

contacted 43:24

contention 44:13

continuous 23:14

contractor 7:2 13:20 33:15,22

contractors 6:17 49:13,16

conversation 17:15 39:21

conversations 30:3

copy 17:22 48:12

correct 12:8,18 13:9,21 16:25 17:14 18:2,4,5 25:2 26:13,22 27:1 28:25 32:7 37:4 38:10,12 40:20 43:10 44:23,25 45:3,16 47:13 50:19

correctly 8:17 12:5 24:22 40:18

cost 32:1 49:7

costs 34:10

counsel 10:1

couple 8:25 9:5 38:16 39:20

court 5:11 6:8 9:23 10:7,22 46:8

COVID 38:17 39:6 40:5 41:6,8 42:13 45:24

crack 21:11

crawl 16:3,6

create 14:13,14,16 21:6

created 36:1,10 39:5

critical 41:15

critiqued 41:21

current 40:9

cut 20:4,5,9,17

cutting 22:7

CV 6:3

D

D&r 24:1

D-E-J-A-N 42:18

damage 7:24 10:15,18 11:2,5,8, 11 12:12 14:8,22 16:20 19:4 24:23,24 25:17 26:10 30:17,24 36:2,21 40:2 41:16 42:16 44:22 48:2

damaged 11:24 25:16 44:6 51:20

damages 36:4 41:5

date 35:14 38:21 43:22

dated 36:22 41:11

David 5:4,9 53:19

day 39:3

deal 39:25 41:18

dealt 8:20 39:10,25

decision 48:16 49:1

default 31:17

defense 9:3,6 53:14

define 35:19

definition 20:8 26:19 35:12

Dejan 42:18 45:4

delineate 37:15

delineation 35:9

demolishing 24:1

demolition 17:13

depending 34:14

depends 19:22 20:8

DEPONENT 53:24

deposed 5:5 8:1 39:23

deposition 5:1 17:19 44:1,12 45:16,18 46:11 47:11 52:9

depositions 9:19

depreciation 37:2

destruction 22:19

detach 27:20,24 29:14,17

detached 28:5,8,16

detaching 24:3 35:9

determination 17:11

determine 13:23 32:9

develop 37:5

diagram 14:24 15:9,12,14 17:18
37:25 38:7 46:11

difference 45:23

digital 38:3

dimensions 31:14

direct 30:2 40:21

directed 36:22

directly 7:1 8:1

disagree 19:3

disclosure 46:18,21,23

discovery 47:20

discussed 37:12 40:1

discussing 36:11 39:12 42:3

document 10:8 15:5,7 36:15
47:12

documents 47:10

door 24:23 27:7 29:19,22 30:1

drafting 11:21

drain 49:20 50:13

Draingo 12:2 15:10 18:1 37:23,
24

draws 14:10

dress 21:17,18

driveway 30:17

dropping 33:10

DRT 47:18

duly 5:5

dumpster 30:17,24 33:11

**E**

e-mail 47:3

e-mails 47:23,25

earlier 37:12,25 39:21

easy 28:12

edit 37:17 48:3

edited 36:12

edits 35:20 37:20 38:19 45:19
48:22

education 6:3

effort 18:21

Eighty 9:21

electrical 34:7,9,14

electrician 34:4,5,11

elevation 16:25 21:24 22:2
23:11,18 24:15 32:18,19 43:17

employee 12:6

end 22:10

ended 39:11

enforced 34:1

entire 20:1,7,18,23 23:11,22
25:9,15

entry 26:2

envelope 13:18

episodically 7:16

errors 42:12

estimate 6:23 9:19 11:22 13:24
14:13,14,20 15:2 17:22,23,25
18:1,4,6 22:22 23:21 25:1,6 26:3,
12,16 27:23 29:10 31:12 32:6
35:4 36:5,6,10,12,21,23,25 37:6,9
38:9,13,15,21 39:5,7,14 40:18,24
41:11,14 42:18,20 43:7,14,20
44:17,21 45:15,21,23 46:7,16
47:4 49:12 50:20 52:14,17,19,20

estimates 6:15,17,21 7:24 8:6,9,
23 9:6 13:5,15 14:23 35:17 47:16,
18 49:7

estimation 42:10,15

estimators 31:21 48:18

exact 8:12 11:14

EXAMINATION 5:7

examined 5:5

executed 9:25

exhibit 17:19,20 46:8,10,12,17,
25 47:7 48:13 53:15

exhibits 46:6

existing 15:21 17:3,13 18:25
19:8 50:17

exists 19:10

exit 22:7

exits 16:8

expand 21:15,16

expansion 21:7,9,12

experience 6:4 12:24 13:13,15,
16

expert 10:11 46:20,22

explain 25:3,5

explained 16:17 50:23

exposed 50:4,5 51:13,18

exterior 16:18,19 23:17 24:17,18
27:14,15 34:7,9 43:13 49:19
50:18

extra 32:2 33:23

extraction 34:17,19

eye 41:15

**F**

facade 16:19

fact 29:2 34:21 40:2 41:24

fair 15:3 38:7 41:3

familiar 9:16

fan 28:19,20,22,25 29:2

feet 16:10 18:17 21:25 22:12,14
27:5 30:15,23

figure 14:18

figured 34:12

figuring 20:1

file 42:2,3 48:5,15,21

fill 20:10

filled 20:18

final 39:8,15

find 47:3

finds 13:11

fire 14:22

firm 8:2,3,18 36:23 41:22 47:23

firms 6:22 7:8,14,15 8:22 9:6 53:14

Fisher 9:11 10:24 32:10 46:10, 20,24 47:6,13,15 53:8,12,19

five-minute 32:20 53:4

fixture 27:18,19

fixtures 16:22

flash 19:2,11

flashing 19:16

floor 14:7,9 25:7,9,15 40:19 44:5

flooring 24:21 39:25 40:13,14 41:12 45:12 48:16

floors 16:20

Florida 5:15,23,25 9:15 11:9

follow-up 53:16

footprint 16:8

foregoing 5:1

form 36:13

four-foot 18:19

framer 23:25

framing 22:12,15 23:3 26:21

Freeport 5:15

freeze 13:7

Freud 9:17,18

front 17:23 24:2

full 5:8 46:20,22

### G

general 23:3,25 30:14 31:20,23 33:14,22

generally 13:10 28:10

gentleman 42:17

give 8:8 9:5,8,9 25:4 38:20 42:19

good 16:6 45:18 51:5 53:8

grabbed 35:8

grade 49:21,23 50:2 51:22

grand 39:2

greatly 22:23

grew 5:18,21

Griffin 15:11 35:23

Griffins 30:3,6,8 35:24

Griffins' 12:6 49:19

ground 33:12

group 13:12

grow 5:17

guess 19:11 29:8 30:21

guesstimate 8:12

guide 31:21

guys 13:4

### H

H-E-R-R-I-N-G 5:12

Haag 13:18

half 23:8

halfway 51:18

Halkos 45:4

hall 40:19

handle 6:22 7:8 33:15

handwritten 48:4

handy 9:10

happen 37:20

happened 35:21 39:8

hard 42:19

hardwood 25:2 26:4 40:14,19

He'll 13:6

hear 51:6

heater 28:22 29:4,5

height 21:3

Herring 5:4,9,10,16 15:6 32:24 47:9,22 53:13

hidden 50:4

higher 52:21

hire 33:23

hired 10:13 44:22

hold 28:1 36:17 40:16 41:24,25 50:14

hole 22:7 50:18

home 12:6 15:11 16:3 23:22 24:2,18 26:8 30:24 43:13 49:19

homeowner 24:22

homeowners 6:21

honest 34:1

honestly 29:8

hour 23:25 31:1 32:10

hours 31:2,18 32:5,11,12,13,14, 19 34:3,10

house 16:9,25 23:17 25:2 40:13

hundred 8:25

Hurricane 7:13

### I

Ian 7:13

idea 8:8,14 51:6

IICRC 13:17

impact 19:18 49:25 51:8

impacted 14:12 51:16

inappropriate 26:14

Incidentally 40:7

Incidently 51:1

include 26:3 40:13 41:12 48:3

included 26:4,11,15,18,25 32:17 39:6 40:19,25 41:4 43:13 50:19

includes 18:1 22:2 23:21 25:1 31:15

including 23:15 24:16

incorrect 53:2

independent 7:18

industry 6:16

information 17:10 37:24 39:18 43:8 48:3

initially 14:3 41:23

insert 31:13

inside 31:6

inspected 42:24 43:10

inspection 12:5,16,17 13:19
  15:1 37:13

inspections 12:11

inspector 12:22

insurance 6:15 7:5,7,8,12

insured 7:1

insureds 9:2

intended 30:9

internal 39:5

internally 39:10

interval 45:11

invoices 47:18,20

involve 6:24 18:16 22:14 33:19

involved 34:4,20

involving 11:5,12,21

iron 11:5,7,12,22 15:11,21 16:1
  17:3 18:12 38:6 44:8

issue 17:6 44:19

item 18:4,9 22:11 23:24 30:25
  32:25 34:16 40:22 45:22 47:19

items 6:19 18:10 19:25 21:22
  23:9 24:15

## J

jack 18:22

Jim 9:14 47:15

Jimmy 50:14

job 12:20 31:9 33:3,15,23 34:20
  45:1 48:5

jobs 11:11,15,21

Joe 12:6,13

John 9:17,18

joints 21:12

juncture 40:6

jury 6:13 31:11

## K

K-N-E-C-H-T 10:24

kicked 35:1

kind 6:24 13:2 16:1 20:8,16 21:8
  24:5 31:6,7 33:23

kinds 14:24

kitchen 22:20

Knecht 10:19

knew 44:13 52:8

knowledge 30:12

## L

labor 23:3 31:15,16 34:17

large 7:12

larger 18:20,21 31:9 52:14,19

late-filed 48:12,13 53:13,18

law 8:2,3,7,9,18,22 36:23 41:21

lawyers 6:21

leave 29:25

left 23:11

letter 36:21

licensed 13:20

lieu 15:1

light 27:17,19 28:4

limited 24:10

list 40:9 47:19 53:14

listed 47:16

lit 31:8

literally 8:5 37:17 49:3

litigation 36:9

live 9:23

lived 33:25

living 40:20,22

located 11:8,9

location 15:2,10,11,21 43:10

long 5:23 6:11

longer 20:11 41:8

looked 38:7 41:14,20 42:11
  45:15

Lord 7:10

loss 13:3 14:3 43:10 52:10

lot 7:10,14,15 35:20

Louisiana 5:18,21,22,25

## M

M-E-S-S-I-C-K 42:23

M-L-A-D-E-N-O-V-I-C 42:19

Madam 6:8

made 12:11,17 42:11,12 45:20
  48:9,20,21,24 49:4

magnitude 33:15

mailing 41:21

main 41:6 42:12

major 40:4 46:3

majority 39:12

make 13:10 16:23 17:11 21:1,19,
  21 31:11 42:13 44:14,15 45:2
  46:6,16,18,23 47:5 50:17 52:9
  53:6

makes 31:10

making 26:19

management 33:2

manner 8:19

mark 17:18 53:15

marked 17:20 46:17,25 47:7
  48:13

market 31:22

Mason 30:25

masonry 31:8,24 32:2

match 24:18 26:9

material 30:21 31:15

matter 41:24

means 18:13 34:21

measurements 13:9

mechanized 33:9

**meets** 35:11

**mentioned** 39:21

**merged** 8:18

**Messick** 37:8 42:22 48:9 53:18

**metal** 18:17,19 19:13

**Michael** 7:14 45:4

**miles** 33:25

**mind** 17:7 27:25 45:14

**minimal** 35:1

**minimizes** 31:7

**minimum** 34:17,21 35:2

**minor** 46:2

**mirror** 28:4,7

**mirrors** 28:11

**misnomer** 14:4

**missed** 46:12

**mix** 34:12

**mobility** 24:10

**modifications** 44:17

**moment** 13:8

**monolithic** 20:11,12 21:4

**Morgan** 7:23,25 8:1,19

**mortared** 29:23

**move** 5:25

## N

**names** 9:5

**Nation** 8:2,3,6,9,17 36:23 41:21, 25

**necessitate** 16:22 27:18

**necessitates** 27:9

**needed** 31:7 39:23,24 42:13 52:9

**ninety** 9:21

**normal** 14:14

**note** 26:19 31:5 52:21

**noted** 39:24 41:16

**notes** 13:10 37:7 48:4,7,8,10,15,

24 53:18

**notice** 47:11

**number** 8:12 16:9 39:15,24 46:8

**numbers** 31:12 49:14

## O

**observations** 14:23

**observed** 32:22 53:9

**obvious** 41:19

**October** 36:6,8,22 39:1 41:11,22 42:4,5 43:5 46:7,16 47:16 52:3,6, 16,17,25 53:1

**office** 37:8 42:22 48:9

**officer** 33:16,24

**opening** 27:7

**operate** 6:5

**operated** 6:11

**opine** 50:24

**opinion** 27:10 50:23

**oral** 37:23

**orange** 15:18

**oriented** 38:18

**original** 40:24 43:7,13 48:8

**originally** 5:21 10:15 22:18 37:7 42:21

**OSHA** 33:7 34:1,2

**outer** 16:24

**overhead** 33:17,19,21 35:7

**owners** 9:1

## P

**p.m.** 5:2

**paid** 35:14,16

**paint** 31:25

**panel** 19:20

**panels** 18:20,21,23 19:23

**parsing** 51:14

**part** 5:19 6:23 15:25 16:13,14 19:13 20:10 33:17,21 34:12

**partly** 21:16

**parts** 11:23

**pass** 9:12

**patch** 20:6 21:6

**pattern** 25:22

**patterned** 25:24

**penetration** 16:24 17:3 19:1,10 49:18 50:16,17

**people** 7:17 9:9

**percent** 7:19 9:3 23:1

**percentage** 22:1,3 25:19

**perfectly** 26:10

**person** 10:17

**personally** 43:3,9,16 44:24

**phone** 49:3

**phonetic** 12:13 45:4

**physical** 12:5

**pick** 7:14

**picked** 35:10

**picture** 24:7

**pictures** 13:9 14:6

**pierce** 16:17

**Pilot** 7:15

**pipe** 11:5,7,22 14:2 15:19,20,21 16:1 18:12,14,22 19:1,9,13,14,15 44:6 50:7

**pipes** 11:12 14:10,19

**piping** 15:2,11,12 17:4,14 27:13

**place** 29:25 34:25 38:19

**places** 21:11

**plaintiff** 9:4

**plan** 14:7,9

**plumber** 12:14,17 13:20 14:10, 18 16:16 17:5,16 18:24 19:5,6,7 20:4 27:11,12 36:3 37:12,17,18 40:2 43:2,6,9,16,19,21,24,25 44:11 49:24 50:12,13,21

plumber's 36:5

plumbing 11:22 14:25 15:22 37:10 38:6 40:25 41:1,5 46:11 47:24 48:1,3

plywood 30:16

point 14:12,13 21:5,7 22:16 36:5 38:1 40:1 42:7,9 43:24 44:13,20 45:20 48:21

porch 16:9

portion 15:18 16:7

posed 44:3

possibly 52:9

pour 20:11,12,23 21:4

premises 42:25 43:4

prepare 18:6 45:15

prepared 8:9 13:24 15:10,14 36:23

present 25:6 30:6

presently 36:13

pretty 13:2 16:1 21:20 23:1 25:24 30:20 50:8

price 40:9 49:14

pricing 31:13

primarily 11:7

primary 13:16

problem 14:2 26:1

problems 31:24

process 13:6 14:5,14 28:6 35:21

produce 14:7

produced 8:10

produces 13:11

product 21:20

profit 35:7

property 9:1 12:12,15 13:7 43:18 49:12

proposed 37:13 38:6

protocols 38:18 39:6 40:5 41:6,8 45:24

provide 9:11 14:6

provided 37:8,16,18 42:21

public 7:4

pull 30:22

push 26:7

put 14:21 15:7 17:13 18:13,22,23 19:2,9,11 21:14,18 28:10,14 29:9 30:22,23 32:15 36:15,17 37:8

putting 34:23

PVC 15:12,18,20

## Q

qualifications 12:24

quality 20:9,16 21:8

question 17:7 19:12 45:11 51:5

questions 43:23 44:2,4 53:10

quick 10:23 46:7 53:6

## R

R&r 30:14

R-I-S-E 10:8

raised 45:11,14

ramp 24:1,2,5,6,8,9 35:10

real 10:23 46:7 49:12

rear 16:25 21:24 22:1,5 23:14,18 40:2 43:17

reason 17:2 20:6 25:16 29:12,19 44:5 51:23

reasonable 20:14,15,19 25:14 28:17 29:18 40:10

rebricking 23:21

recall 46:4

received 43:1

recent 47:10

recess 32:22 53:9

redo 27:13

reduce 22:17

reduced 22:21,22,23 23:1,4

reference 24:7

referring 28:4

refers 28:24

refinish 20:6 25:25 26:12,23

refinished 20:19 25:9,10,12 40:13

refinishing 26:5

regs 34:1

regular 35:23

related 41:1 46:21

relative 48:15

relied 17:10

relying 17:9

remediation 34:17 41:2 49:11

remember 24:21

remodel 30:9

removal 23:10 45:23

remove 18:21 19:1,17 21:25 22:9,11 24:14 27:17,20,22 28:8 29:11,20 30:18,20

removed 11:24 16:14 38:18 40:5 42:14

removing 16:22 24:2 26:25 29:3

repair 16:23 18:15,18 20:14,16 26:15 40:19,25 41:2 49:12

repairs 41:12

replace 15:20 19:13,17,21 20:1, 18 21:25 22:12 23:18 24:17 25:7, 14,15,18 26:8 27:17,20,22 28:8, 19 29:4,11,21 30:18 38:6

replaced 25:8,11 28:6,9

replacement 23:10 40:25 41:1 43:12

replacing 11:23 18:12,17 19:6, 14,15 20:7 22:14 23:16 24:13 25:1 26:4,25 27:9,19 28:13,18

report 12:4 37:10,11 46:11

reporter 5:11 6:8 10:7,22 46:8

repour 21:14

represent 9:1

representative 37:23

**requested** 47:10

**require** 18:15

**requirement** 33:8

**reset** 27:21,24 28:5,16 29:12,14,
17,20

**resetting** 24:4 35:9

**Response** 36:21 42:16 44:22

**responsible** 31:21 45:7

**rest** 7:20 9:4

**restore** 25:20

**resurfaced** 21:19

**retired** 12:25

**return** 12:15

**returned** 36:10

**review** 44:23,24 53:5

**reviewed** 41:20 42:15 45:1,17
49:14

**reviewing** 29:2

**Risedoc** 10:5

**Risedocument** 10:6

**risk** 25:25

**roof** 13:19 18:10,14,15 19:1,16,
18 25:15 41:1,4

**roofing** 18:17,19 19:13

**Rooker** 15:25 50:14,25

**Rooker's** 15:17

**room** 16:21 28:23 40:20,22

**run** 13:6,7 22:7 25:25

**running** 16:1 44:6

**runs** 16:7 18:14 19:16

———————————
                **S**
———————————

**S-O-N-A-T-A** 5:14

**safety** 33:6,12,16,24

**SAITH** 53:24

**sanded** 25:9

**save** 23:16

**scan** 14:6

**schematic** 37:17,18

**sconce** 28:3

**scope** 13:10,23 14:15 15:15
31:14 36:4 37:5,7,12,16,19 42:21
45:19 48:8

**scoped** 26:22

**scoping** 13:12

**screen** 15:7 36:15 46:8

**secure** 49:14

**seeps** 25:17

**Segarra** 12:7,13,25 13:14 30:5,9
36:1 37:14 42:24 43:3,9

**Segarra's** 12:20 37:9

**send** 8:5 14:8,9,16,17,18 41:25
45:5 53:19

**sends** 13:11

**senior** 12:22

**septic** 16:8,10

**sergeant** 12:25

**series** 43:23 44:2

**services** 32:1

**set** 29:22 30:16,19

**sheathing** 30:15,18

**Shoemaker** 9:14

**show** 36:14 46:13

**shower** 29:19,21

**showing** 14:24 15:10

**shows** 27:22 30:13,14

**simple** 6:14 14:21 25:16 40:24

**simply** 19:8 49:7

**sink** 29:11

**sir** 5:13 6:13 11:25 12:10,19 15:4,
8,13 18:8 21:23 22:13 23:12
26:13 27:16 30:4 31:3,19 32:4
33:1 35:5 39:16,17 45:25 48:25
49:3

**site** 33:19 36:2 37:9,13

**sitting** 41:17

**situated** 14:25

**six-and-a-half** 13:2

**sketch** 13:8 14:7,17 35:25 36:2
43:1

**skid-steer** 33:10

**slab** 16:9 20:1,7,10,11,18,21,23
21:19 44:7

**slash** 30:25

**slightly** 31:9

**small** 25:18

**Sonata** 5:14

**sort** 6:4 31:15

**Sounds** 53:8

**south** 11:9

**space** 16:3,6

**speak** 43:19

**speaking** 28:10 42:10

**specific** 33:20 48:20

**specifically** 42:10 49:24 51:14,
15 52:2

**specificity** 50:7 51:24

**spell** 5:10 10:7,21 42:19

**spoke** 17:6 43:21,24 51:4 52:3

**spoken** 43:16

**square** 18:17 21:25 22:12 30:15

**staff** 33:16 42:10,15 43:21,23
44:3,4

**started** 20:12

**starts** 40:22

**state** 5:8 25:6 31:20

**stated** 52:7

**statement** 15:3 38:7 41:3

**states** 11:16

**steps** 23:16

**stone** 31:1

**Street** 5:14

**stricken** 22:22

**strict** 26:19

**structural** 14:20

**structure** 11:23 14:12 16:13
17:13

**structured** 19:22

**structures** 35:6,11

**stuff** 42:13

**stupid** 28:11

**subject** 36:9

**submitted** 7:24 8:4,15

**subsequent** 37:20

**substantial** 23:2

**substantive** 46:1

**suggest** 15:9

**suggesting** 20:22

**supervision** 33:2,5,6

**supervisor** 33:12

**supposed** 33:11

**surely** 41:20

**surface** 22:2,3,4 23:11

**sworn** 5:5

**system** 11:23 14:25 48:3

———————————

**T**

**taking** 34:15

**talked** 49:16 52:23,24 53:1

**talking** 7:3 24:1,3 28:21 39:4
51:21

**tank** 16:8,10

**Team** 36:21 42:16 44:22

**technically** 35:11 49:22

**telling** 23:19 40:12 51:9,15

**ten** 28:12

**Tennessee** 11:18,20

**terms** 6:14 14:21 40:24

**testified** 9:23

**testimony** 15:17 24:22

**thing** 6:4 17:25 26:9 31:15 37:15
41:19 42:12 52:21

**things** 7:20 11:6 33:20 37:21

39:5,20 41:6 43:25 44:8 46:2
48:20 49:2 53:13

**thinking** 47:2

**thought** 22:18 26:14 51:5 52:13

**tile** 26:25 27:3,10 29:3,23

**time** 7:11 8:10,20 13:8 30:21
31:7,8 32:15 33:8 36:19 38:5,11
39:13 43:7 51:6 52:1

**times** 9:23 28:12 33:13 36:12

**tiny** 34:22

**title** 12:20

**today** 25:11 39:12 41:8 47:10

**toilet** 29:11,15

**told** 7:21 17:7 43:15 49:24 50:12
51:11,12,25 52:20

**Tomkins** 5:7 6:8,10 11:1 17:18,
21 32:12,20,23 46:6,13,18,22
47:1,8,21 48:11,14 53:4,10,17,22,
23

**top** 13:4 20:23 21:4,19 31:18

**torn** 16:14

**total** 31:7 32:9 35:6 39:2,18

**totals** 39:14

**touch** 29:3 42:5

**touched** 14:19 42:9 44:5 48:21

**touching** 34:6 44:7

**TPA** 7:14

**trained** 13:3

**training** 13:13,15

**trench** 20:5 21:14

**trial** 52:9

**true** 6:25 21:13

**tub** 29:11,19,24,25 30:1

**two-year** 45:10

**type** 49:6

**typical** 13:6 33:14 44:8

**typically** 7:7 30:16 33:19,23

———————————

**U**

**U.S.** 12:25

**ultimately** 36:12 38:18 40:1

**umpire** 10:11,12

**underneath** 19:16 21:6 23:25
30:17,23 33:7

**undershoot** 31:25

**understand** 6:20 8:17 12:4
15:17,25 16:5,16 27:22 31:11,12
38:5 41:7 44:15 52:10,11

**understanding** 11:2 15:22 16:4,
11 24:24 38:11 45:19 49:18,21
50:3

**understood** 17:16

**uniform** 20:20 21:1 24:20

**unit** 31:13

**update** 40:9

**updates** 36:10

**USA** 7:24 10:15,17 11:2,8,11
12:12 14:8 36:2,21 42:16 44:22
47:18 48:2

**user** 24:10

———————————

**V**

**vanity** 29:16

**varies** 7:11

**veneer** 23:10

**vent** 15:20 19:1,9,13,14,15

**ventilation** 28:19,22,25 29:2

**version** 39:8

**visible** 50:16

**visit** 37:9

**visual** 15:1

**visualize** 14:22

**voice** 48:20

———————————

**W**

**W-R-I-T-E** 6:9

**wall** 16:18,24 27:3,14,15 28:3,21
29:4,5 34:9,15 40:3 49:19 51:19

**walls** 27:3,4,6 34:7

**wanted** 36:17 44:12,14 45:17
51:2

**water** 13:17 16:20 24:24 25:16,17
26:10 34:17,19

**whatnot** 8:6

**wheelchair** 24:10

**wind** 14:22

**wind-oriented** 11:6

**window** 28:14

**windows** 32:16,17

**wood** 16:20 24:1,6,21 25:17,19,
22,23,24

**wooden** 24:2

**word** 36:7,8

**words** 51:15

**work** 6:4 7:1,16 8:4 9:3 10:11,12,
16 13:24 15:15,22 16:15 18:10
31:6,14 32:3,16 34:4 37:6 41:1,2
49:6,7,11,15 50:9,18 53:14

**worked** 7:18,23 8:1 12:2 13:25

**working** 13:1

**world** 35:23

**worth** 6:19

**write** 6:15,16,17,18,21,25 7:5,9,
11 14:23 15:2 52:17

**Writeloss** 6:5,7,9,14 10:4

**writing** 6:7,23 38:3

**written** 8:23 9:6 35:17 43:8

**wrong** 29:1 52:20

**wrote** 36:4,5 38:9,13,15,21
42:17,20 52:14,19

**WTR** 13:17

---
                       **X**
---

**Xactimate** 6:18 18:6 31:6,10,12,
17,19,22 32:6,17 35:2

---
                       **Y**
---

**yankee** 5:20

**year** 6:18 9:20,23 10:1 36:8 39:2,
9,11 52:4,14 53:3

**years** 5:24 7:18 8:24 9:7 13:2,3

**yesterday** 51:4,7